1   Elizabeth J. Cabraser (SBN 083151)
    Scott P. Nealey (SBN 193062)
2   Cecilia Han (SBN 235640)
    LIEFF, CABRASER, HEIMANN &
3   BERNSTEIN, LLP
    Embarcadero Center West
4   275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
5   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
6
7   *[Additional Counsel Listed on Signature Page]*
8   *Attorneys for Plaintiffs and the Proposed Class*
9
10              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
11                  OAKLAND DIVISION
12
13  HELEN TARAGAN; FRANCES          Case No.  C-09-03660 (SBA)
    JEANETTE TAYLOR; CLARENCE
14  TAYLOR, on behalf of themselves and a   **PLAINTIFFS' STATEMENT OF RECENT**
    class of those similarly situated,       **DECISIONS**
15
              Plaintiffs,
16
        v.
17
    NISSAN NORTH AMERICA, INC., a
18  California corporation; NISSAN MOTOR
    COMPANY, LTD., a Japanese company,
19
              Defendant.
20
21
22
23
24
25
26
27
28

1             Plaintiffs respectfully submit this Statement of Recent Decisions, providing copies

2    of certain opinions published since the filing (on January 8, 2010) of Plaintiffs' brief in

3    opposition to Defendant's motions to dismiss and strike.  *See* N.D. Cal. Local Rule 7-3(d)

4    ("Before the noticed hearing date, counsel may bring to the Court's attention a relevant judicial

5    opinion published after the date the opposition or reply was filed by serving and filing a

6    Statement of Recent Decision, containing a citation to and providing a copy of the new opinion -

7    without argument.").

8             The opinions are:

9             A.    *Keilholtz v. Lennox Hearth Products Inc.*, No. C 08-00836 CW, 2010 WL

10   668067, 2010 U.S. Dist. LEXIS 14553 (N.D. Cal. Feb. 16, 2010), attached hereto as Exhibit A.

11            B.    *Walter v. Hughes Communications, Inc.*, No. 09-2136 SC, 2010 WL

12   366639, 2010 U.S. Dist. LEXIS 5859 (N.D. Cal. Jan. 26, 2010), attached hereto as Exhibit B.

13            C.    *Carlsen v. Freedom Debt Relief, LLC*, No. CV-09-55-LRS, 2010 WL

14   1286616, 2010 U.S. Dist. LEXIS 29056, (E.D. Wash. March 26, 2010), attached hereto as Exhibit

15   C.

16                           Respectfully submitted,

17   Dated:  May 3, 2010         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

18

19            By:   */s/ Scott P. Nealey*

20                    Scott P. Nealey

21            Elizabeth J. Cabraser (SBN083151)
              Scott P. Nealey (SBN193062)
              Cecilia Han (SBN 235640)

22            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
              275 Battery Street, 30th Floor

23            San Francisco, CA 94111-3339
              Telephone: (415) 956-1000

24            Facsimile: (415) 956-1008

25

26

27

28

1                                   Dawn M. Barrios (#2821)
Bruce S. Kingsdorf (#7403)

2                                   BARRIOS, KINGSDORF & CASTEIX, L.L.P.
701 Poydras Street, Suite 3650

3                                   New Orleans, LA 70139-3650
Telephone: (504) 524-3300

4                                   Facsimile: (504) 524-3313

5                                   *Attorneys for the Plaintiffs and the Proposed Class*

# Exhibit A

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Kirk KEILHOLTZ and Kolleen Keilholtz for them-
selves and on behalf of those similarly situated,
Plaintiffs,
v.
LENNOX HEARTH PRODUCTS INC.; Lennox
International Inc.; Lennox Industries and Does 1
through 25, Inclusive, Defendants.
**No. C 08-00836 CW.**

Feb. 16, 2010.

ORDER GRANTING PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

CLAUDIA WILKEN, District Judge.

**\*1** This case involves the sale of single-paned
sealed glass-front gas-burning fireplaces. Plaintiffs
claim that the sale of these fireplaces violates the
California Unfair Competition Law (UCL), Califor-
nia Business & Professions Code § 17200; the Con-
sumer Legal Remedies Act (CLRA), California
Civil Code § 1750; and the doctrine of unjust en-
richment. Plaintiffs have filed a motion for class
certification. Defendants[FN1] oppose the motion.
The matter was taken under submission on the pa-
pers. Having considered all of the papers filed by
the parties, the Court grants Plaintiffs' motion.

> **FN1.** Defendants Lennox Industries and
> Lennox International are two of the three
> parent companies of Defendant Lennox
> Hearth Products.

BACKGROUND

On February 6, 2008, Plaintiffs filed this putative
class action on behalf of themselves and all simil-

arly situated persons who are the owners of homes
in which Defendants' glass-enclosed gas fireplaces
are installed. According to Plaintiffs' fourth
amended complaint (FAC), Defendants are the
"developers, designers, manufacturers, assemblers,
testers, inspectors, marketers, advertisers, distribut-
ors and sellers of Superior [FN2] and Lennox brand
single pane sealed glass front gas fireplaces." FAC
¶ 8.

> **FN2.** Superior was acquired by Defendants
> in 1998. FAC ¶ 17b.

Plaintiffs allege that Defendants sold the fireplaces
with the specific intention of having builders install
them in homes throughout the United States. FAC ¶
14. By selling the fireplaces, Defendants represen-
ted to consumers that they were "safe, of mercantile
quality, and fit for their intended and reasonably
foreseeable uses, and had sufficient protections and
warnings regarding potential dangers and hazards
which reasonable consumers would expect and as-
sume to be provided in order to make a decision
whether to purchase a home installed with [the fire-
place] or purchase [a fireplace]." *Id.*

Plaintiffs further allege that Defendants failed to
disclose or concealed the fact that the fireplaces are
dangerous and unsafe given that the ungarded
single pane glass-sealed front may reach temper-
atures in excess of 475 degrees Fahrenheit, which
may cause third degree burns to skin contacting the
glass. *Id.* at ¶ 15. Lastly, Plaintiffs allege that be-
cause of Defendants' conduct and omissions, mem-
bers of the putative class came to own residential
homes in which the fireplaces were installed. *Id.* at
¶ 16.

On March 30, 2009, the Court granted in part De-
fendants' first motion to dismiss the complaint.
Plaintiffs were granted leave to amend and they
filed a second amended complaint on June 1, 2009.
On September 8, 2009, the Court granted Defend-
ants' second motion to dismiss the time-barred

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

UCL, CLRA and unjust enrichment claims. Thus, Plaintiffs' CLRA and unjust enrichment claims arising outside of the three-year statute of limitations and their UCL claims arising outside of the four-year statute of limitations were dismissed.

Plaintiffs now move to certify a class consisting of:

All consumers who are residents of the United States and who own homes or other residential dwellings in which one or more Superior or Lennox brand single-pane sealed glass front fireplaces have been installed since February 6, 2004 and all consumers who are residents of California and own homes or other residential dwellings in which one or more Superior brand single-pane glass sealed front fireplaces have been installed since March 1, 2003.

**\*2** "Consumer" means an individual who bought his or her home or fireplace for personal, family, or household purposes.

Excluded from the class are (1) the judge to whom this case is assigned and any member of the judge's immediate family; and (2) anyone who suffered personal injury related to Defendants' fireplaces.

Motion for Class Certification at 2-3.

### LEGAL STANDARD

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

Rule 23(b) further provides that a case may be certified as a class action only if one of the following is true:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

action.

Fed.R.Civ.P. 23(b).

Plaintiffs seeking class certification bear the burden of demonstrating that each element of Rule 23 is satisfied, and a district court may certify a class only if it determines that the plaintiffs have borne their burden. *General Tel. Co. v. Falcon,* 457 U.S. 147, 158-61 (1982); *Doninger v. Pac. Nw. Bell, Inc.,* 564 F.2d 1304, 1308 (9th Cir.1977). In making this determination, the court may not consider the merits of the plaintiffs' claims. *Burkhalter Travel Agency v. MacFarms Int'l, Inc.,* 141 F.R.D. 144, 152 (N.D.Cal.1991). Rather, the court must take the substantive allegations of the complaint as true. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975). Nevertheless, the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action. *Burkhalter,* 141 F.R.D. at 152. In addition, the court may consider supplemental evidentiary submissions of the parties. *In re Methionine Antitrust Litig.,* 204 F.R.D. 161, 163 (N.D.Cal.2001) ( *Methionine I); see also Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 480 (9th Cir.1983) (noting that "some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a);" however, "it is improper to advance a decision on the merits at the class certification stage"). Ultimately, it is in the district court's discretion whether a class should be certified. *Burkhalter,* 141 F.R.D. at 152.

## DISCUSSION

**\*3** In addition to challenging Plaintiffs' class certification, Defendants also argue that Plaintiffs lack standing to assert their claims. The Court addresses the standing issues first.

## I. Standing

The standing inquiry asks whether a plaintiff has suffered an actual or imminent injury that is fairly traceable to the defendant's conduct and that is likely to be redressed by a favorable court decision. *Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1225 (9th Cir.2008). Defendants argue that Plaintiffs lack standing because the reason they no longer use their fireplace has no causal connection to the allegations in their complaint. Defendants argue that Plaintiffs testified that they no longer use the fireplace because it makes the room too warm, not because of any safety concerns. However, this reading misstates Plaintiffs' testimony. Plaintiff Kolleen Keilholtz testified that the fireplace would be "uncomfortable for a majority of people ... [b]ecause of how fast it heats the room." Warne Decl., Exh. V, Kolleen Keilholtz Dep. at 34:18-22. She did not directly state that she stopped using the fireplace only because it heats the room too quickly. In fact, she stated that once she found out that the fireplace could cause third-degree burns, she "ceased using [her] Superior fireplace given the hazard it poses." Kolleen Keilholtz Decl. ¶ 6.

Defendants also argue that Plaintiffs lack standing because they did not suffer any injury from the fireplace. Defendants rely on Kirk Keilholtz's answer to the following question during a deposition:

> Q: And do you believe "the [inclusion of the fireplace in your home has] caused you any loss or property damage of any kind?"

> A: I don't believe so.

However, Mr. Keilholtz has since clarified his response: "The fireplace hasn't caused any fires or injured anyone in my family, but it is a liability. The loss that I have suffered is the one that this lawsuit is about, which includes paying for a fireplace that my family cannot use." Wolden Decl., Exh. 3. Ms. Keilholtz has also stated that she "would not have paid for or even allowed the Superior fireplace to have been installed in my home had I been advised of the high glass surface temperature it generates during operation." Kolleen Kielholtz Decl. ¶ 6.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

Therefore, Plaintiffs have satisfied the causation and injury elements of the standing requirement.

## II. Class Definitions

Defendants argue that class certification must be denied because Plaintiffs' proposed class definition is not precise and the identity of the class members is not objectively ascertainable. "An adequate class definition specifies 'a distinct group of plaintiffs whose members [can] be identified with particularity.' " *Campbell v. PricewaterhouseCoopers, LLP,* 253 F.R.D. 586, 593 (E .D. Cal.2008) (quoting *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978). "The identity of class members must be ascertainable by reference to objective criteria." 5 James W. Moore, *Moore's Federal Practice,* § 23.21[1] (2001). Thus, a class definition is sufficient if the description of the class is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998).

**\*4** Here, the class definition meets this standard. The definition of the class is relatively straightforward. Class members must (1) live in the United States and (2) own a home within which a Superior or Lennox brand single-paned sealed glass front fireplace was installed after a particular date. This definition is not subjective or imprecise. Unnamed Plaintiffs will be able to identify the alleged offending products by viewing the exposed face of their fireplace, which will either bear the name Superior or Lennox.

Defendants argue that the class is unascertainable because the class includes original and subsequent purchasers of homes with the offending fireplace but, under California law, a homeowner's claim is not transferable absent an express assignment. *See Krusi v. S.J. Amoroso Construction Co.,* 81 Cal.App. 4th 995, 1005 (2000). Defendants assert that it would be too difficult to locate the original homeowners. Although finding these individuals

may be challenging, the task is not so formidable as to make the class unascertainable.

Defendants also argue that the class definition improperly includes consumers in California who had a Superior fireplace installed after March 1, 2003 instead of February 6, 2004. Plaintiffs argue that the class period should begin on March 1, 2003 because the statute of limitations was tolled by the March 1, 2007 filing of the related state court class action, *Fields v. Superior Fireplace Company, et al.,* No. 07-AS00918 (Sac.Cty.Sup.Ct.). *See* Warne Decl., Exh. A. That case was stayed pending the outcome of the present case. However, Plaintiffs may not include individuals with claims accruing before February 6, 2004 in their class definition because their claims are outside of the three year statute of limitations for the CLRA and unjust enrichment claims and the four year statute of limitations for the UCL claims. The Court has already dismissed the claims outside of these statutes of limitations.

## II. Rule 23(a) Requirements

### A. Numerosity

Although the parties do not agree as to the exact size of the class, Defendants appear to concede that the number of individuals who own one of their glass-enclosed gas fireplaces is large enough to satisfy the numerosity requirement. In fact, Defendants estimate that 556,639 of their fireplaces were sold to individuals who would be included in the class. The Court therefore finds that the numerosity requirement has been satisfied.

### B. Commonality

Rule 23 contains two related commonality provisions. Rule 23(a) (2) requires that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Rule 23(b)(3), in turn, requires that such common questions predominate over individual ones.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

The Ninth Circuit has explained that Rule 23(a)(2) does not preclude class certification if fewer than all questions of law or fact are common to the class:

> The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

**\*5** *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998).

Rule 23(b) (3), in contrast, requires not just that some common questions exist, but that those common questions *predominate.* In *Hanlon,* the Ninth Circuit discussed the relationship between Rule 23(a)(2) and Rule 23(b)(3):

> The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a) (2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule 23(a)(2), Rule 23(b) (3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.

*Id.* at 1022 (citations and internal quotation marks omitted).

Although Defendants assert that this case does not satisfy Rule 23(a)'s commonality provision, their arguments actually focus on whether common issues *predominate,* and thus are more appropriately directed at the issue of certification under Rule 23(b)(3), discussed below. Rule 23(a)(2) only requires that there be *some* common issues of fact and law. The class members' claims clearly have something vital to this case in common: all class members own a home in which one of Defendants' fireplaces has been installed and their claims are based on a common theory of liability. Rule 23(a)(2)'s commonality requirement has therefore been satisfied.[FN3]

> FN3. Defendants object to Plaintiffs' declaration of Carol Pollack-Nelson offered to establish the commonality and typicality requirements of class certification. Defendants argue that this declaration lacks the foundation necessary to qualify as an expert opinion. On a motion for class certification, the Court makes no findings of fact and announces no ultimate conclusions on Plaintiffs' claims. Therefore, "the Federal Rules of Evidence take on a substantially reduced significance, as compared to a typical evidentiary hearing or trial." *Fisher v. Ciba Specialty Chem. Corp.,* 238 F.R.D. 273, 279 (S.D.Ala.2006) ("the Federal Rules of Evidence are not stringently applied at the class certification stage because of the preliminary nature of such proceedings"). On a motion for class certification, the Court may consider evidence that may not be admissible at trial. Therefore, the Court overrules Defendants' objection.

C. Typicality

Rule 23(a) (3)'s typicality requirement provides that a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon,* 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)) (internal quotation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir.1992).* Rule 23(a)(3) is satisfied where the named plaintiffs have the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members have been injured by the same course of conduct. *Id.* Class certification is inappropriate, however, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Id.* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir.1990), cert. denied, 498 U.S. 1025 (1991)*).

Plaintiffs' claims are all based on Defendants' sale of allegedly dangerous fireplaces without adequate warnings. Plaintiffs' claims are "reasonably co-extensive with those of absent class members." *Hanlon,* 150 F.3d at 1020. Defendants point to particular facts that are unique to Plaintiffs' claims-in particular, the facts that Plaintiffs purportedly did not read the entire manual for the fireplace when they bought their home and that the warnings in their manual may have differed from those of other unnamed class members. These particularities, however, do not render Plaintiffs' claims atypical in the sense that they differ from the claims of most class members. In actuality, Defendants' argument goes to whether the claims can be proved on a class-wide basis or whether, instead, no class member's claims can be established without looking at the particular circumstances of that class member. Thus, this issue is more appropriately characterized as going to Rule 23(b)(3)'s predominance requirement, and is discussed below. Accordingly, the Court concludes that Plaintiffs' claims are typical of those of other class members.

### D. Adequacy

**\*6** Rule 23(a) (4)'s adequacy requirement ensures

that absent class members are afforded adequate representation before entry of a judgment which binds them. *Hanlon,* 150 F.3d at 1020. "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* Defendants advance three arguments for disqualifying the Arnold Law Firm, Cory Watson and Ram & Olsen as counsel, but the Court find all these arguments unpersuasive.

### 1. Conflict of Interest

Defendants argue that the Arnold Law Firm and Cory Watson must be disqualified because they represent Anissa and Jerry Fields in the closely related state court class action, *Fields v. Superior Fireplace Company, et al.* No. 07-AS00918. *See* Warne Decl., Exh. A. Defendants rely primarily on *Kayes v. Pacific Lumber Co,* 513 F.3d 1449, 1465 (9th Cir.1995), in which the Ninth Circuit held that even the appearance of divided loyalties justifies disqualification of class counsel. The court explained, "The 'appearance' of divided loyalties refers to differing and potentially conflicting interests and is not limited to instances manifesting such conflict." *Id.* Here, Defendants have not explained how the Arnold Law Firm's and Cory Watson's simulatenous representation might undermine their ability to adequately represent each class. There is no evidence that the *Fields* plaintiffs and Plaintiffs in the present case have antagonistic interests. Defendants appear to be able to satisfy a judgment in both cases. *See Sullivan v. Chase Inv. Serv., Inc.,* 79 F.R.D. 246, 258 (N.D.Cal.1978).

### 2. Vigorous Prosecution of the Action

Defendants assert that Plaintiffs' counsel's past actions indicate that they will not prosecute the action vigorously. To support this argument, Defendants note that Plaintiffs' counsel failed to serve one of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

the named Defendants, Lennox Industries, until recently. However, Lennox Industries was recently added as a Defendant on September 3, 2009 and Plaintiffs served it within the 120 day requirement of Federal Rule of Civil Procedure 4(m). Lennox Industries never challenged the adequacy of service. Defendants also argue that Plaintiffs' counsel's difficulty in complying with the CLRA notice requirements demonstrate that they are inadequate to pursue this action vigorously. The Court disagrees. Although Plaintiffs' counsel's travails with the CLRA notice gave the Court pause, they are not sufficient to show inadequacy.

### 3. Alleged Unethical Conduct

Defendants argue that proposed class counsel's unethical conduct warrants a finding of inadequacy. Defendants point to two incidents. In the first, before this case was transferred to this Court, another judge of this Court found that Plaintiffs' counsel engaged in "judge shopping, a practice that abuses the integrity of the judicial system by impairing public confidence in the impartiality of judges." Warne Decl., Exh. J at 3:22-24. In the second, Defendants allege that Plaintiffs' counsel sent an investigator "door-to-door in a subdivision within this judicial district to recruit individuals to serve as class representatives." Opposition at 37-38. Defendants assert that this conduct violates California Rule of Professional Conduct 1-400, which prohibits attorneys and their agents from soliciting prospective clients in person or over the telephone. See also Cal. Bus. & Prof.Code § 6151(a). Plaintiffs' counsel respond that they approached homeowners as part of their investigation, and not as part of a solicitation effort. See Rose v. State Bar, 49 Cal.3d 646, 649 (1989) ("An attorney who contacts accident victims for legitimate investigative purposes is not barred from representing them if requested to do so, but it is misconduct to directly solicit such employment."). Although Defendants' solicitation allegations are troubling, without further evidence, the Court will not make any findings as to the propriety of Plaintiffs' counsel's conduct. By itself, Plaintiffs'

counsel's judge shopping does not disqualify counsel. Accordingly, the Court finds that Plaintiffs' counsel is adequate.

### III. Certification Under Rule 23(b)(3)

#### A. Predominance

**\*7** "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted).

#### 1. Predominance of Legal Issues: Choice of Law

Defendants argue that common issues do not predominate because the proposed nation-wide class would be subject to myriad legal issues arising from the application of various state laws. Plaintiffs address this issue by proposing the application of California law to the nation-wide class. Defendants respond that to do so would violate due process.

To apply California law to claims by a class of non-residents without violating due process, the Court must find that California has a " 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair." Phillips Petroleum, Co. v. Shutts, 472 U.S. 797, 821-22 (1995). "When considering fairness in this context, an important element is the expectation of the parties." Id. at 822.

The parties dispute the contacts Defendants maintain in California. Plaintiffs claim that in "the last decade, 82% of the hazardous fireplaces sold under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

the Superior brand [FN4] were manufactured in California." The more relevant time period is that within the statute of limitations: three years for the CLRA and unjust enrichment claims and four years for the UCL claims.

> FN4. Plaintiffs assert that they only refer to Superior brand sales because Defendants did not provide them with information pertaining to Lennox brand sales before they filed their motion for class certification.

Defendants have provided sales and manufacturing information going back to February 1, 2004. Since that date, Defendants have sold 556,369 Superior and Lennox brand gas fireplaces with a sealed, single-pane glass front. Sabin Decl. ¶ 3. Of those, 105,748 (nineteen percent) were sold to distributors, retailers or installers within California. *Id.* at 6. Although nineteen percent does not represent a simple majority of Defendants' overall sales, it exemplifies a significant amount of contact between Defendants and California. [FN5]

> FN5. The parties only provided two categories of sales data: California and non-California sales. Therefore, the Court cannot determine whether California sales constitute a plurality of Defendants' overall sales.

Defendants manufacture, assemble and package their fireplaces in Lynwood, California; Union City, Tennessee; Toronto, Canada; and Auburn, Washington. Dischner Decl. ¶ 5. Since February 1, 2004, 117,016 fireplaces (twenty-one percent) were exclusively manufactured, assembled and packaged outside of California and 17,628 (three percent) were exclusively manufactured, assembled and packaged inside of California. The remaining 421,725 (seventy-six percent) were partly manufactured, assembled or packaged at plants in California and partly in at least one other state. Although many fireplaces were produced exclusively outside of California, the fact that seventy-six percent

maintained a production connection to California weighs in favor of finding that applying California law to the class claims would not be arbitrary or unfair. Plaintiffs have shown that a significant portion of Defendants' alleged harmful conduct emanated from California. Overall, this class action involves a sufficient degree of contact between Defendants' alleged conduct, the claims asserted and California to satisfy due process concerns. *See Parkinson v. Hyundai Motor America,* 258 F.R.D. 580, 597-98 (C.D.Cal.2008); *Mazza v. American Honda Motor Co.,* 254 F.R.D. 610, 620-21 (C.D.Cal.2008).

**\*8** Defendants argue that, even if Plaintiffs' claims against them comport with due process, choice of law principles do not support the application of California law. However, the Court notes that it must apply California law to California statutory claims. Even if the consumer protection and unfair competition statutes of other states differed considerably from those in California, Defendants are in no position to force Plaintiffs or unnamed class members to sue under the statutes of those states. If they wish, unnamed class members may opt out of the current class action and attempt to sue Defendants under the statutes of their state of residence.

Although the Court finds it unnecessary to engage in a choice of law analysis in order to apply California law to California statutory claims, state and federal courts in California have conducted such an analysis. *See e.g., Parkinson,* 258 F.R.D. at 597-98; *Mazza,* 254 F.R.D. at 620-21; *Wershba v. Apple Computer,* 91 Cal.App. 4th 224, 241-44 (2001). Therefore, the Court will do so as well. The same choice of law analysis will apply to the unjust enrichment claim.

Because applying California law to Plaintiffs' claims against Defendants comports with due process, the Court presumes that such law applies to the claims of the nation-wide class unless Defendants meet the "substantial burden" of showing that foreign law, rather than California law, applies. *Martin v. Dahlberg,* 156 F.R.D. 207, 218 (N.D.Cal.1994); *see Church v. Consolidated*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

*Freightways,* 1992 WL 370829, *4 ("This Court generally presumed that California law will apply unless defendants demonstrate conclusively that the laws of the other states will apply.").

"When a federal court sitting in diversity hears state law claims, the conflicts laws of the forum state are used to determine which state's substantive law applies." *Orange Street Partners v.. Arnold,* 179 F.3d 656, 661 (9th Cir.1999). The Court thus looks to California choice of law doctrine to determine whether to apply California law or some other state's law to the claims.

California has adopted the "governmental interest" approach to choice of law issues. As the California Supreme Court has explained,

> the governmental interest approach generally involves three steps. First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied.

**\*9** *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal.4th 95, 107-08 (2006) (citation and internal quotation marks omitted). "A party advocating application of foreign law must demonstrate that the foreign rule of decision will further the interest of that foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Tucci v. Club Mediterranee,* S.A., 89 Cal.App.

4th 180, 188-89 (2001). If California law can be applied without violating the policy of the foreign state, there is a false conflict, and California law should be applied. *See id.*

Defendants argue that the consumer protection statutes of the non-forum states are different from those of California and they attach an appendix which catalogues state-by-state variations involving reliance, scienter, damages and other elements necessary to Plaintiffs' claims. *See* Appendix of State Law Variations. Although Defendants have pointed out variations between California law and the relevant law in other jurisdictions, Defendants have not met their burden of showing that the differences between California law and that of the other jurisdictions are material. *See Washington Mutual Bank v. Superior Court of Orange County,* 24 Cal.4th 906, 919-20 (2001) (difference among the state laws must be material).

For instance, Defendants argue that Plaintiffs suing under the UCL in California are limited to restitution and injunctive relief but similar laws in other jurisdictions permit greater relief, such as actual damages, treble damages, punitive damages and attorneys' fees. However, "a CLRA violation, which serves as a predicate to a UCL violation under the UCL's 'unlawful' prong, provides for each of the remedies that Defendant[s] contend[ ] would be unavailable with the application of California law to a nationwide class." *Mazza,* 254 F.R.D. at 622.

Defendants also argue that the unjust enrichment laws of the fifty states vary such that a material conflict exists. Although many states follow the Restatement's definition of unjust enrichment, not all do. *See In re Terazosin Hydrochloride,* 220 F.R.D. 672, 697 (S.D.Fla.2004). Laws concerning unjust enrichment do vary from state to state. But differences in state laws do not always outweigh the similarities, especially in cases concerning unjust enrichment claims. *See, e.g., Westways World Travel, Inc. v. AMR Corp.,* 218 F.R.D. 223, 2240 (C.D.Cal.2003) (certifying nation-wide class of unjust enrichment claimants). As noted in *Schumach-*

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

*er v. Tyson Fresh Meats, Inc.,* 221 F.R.D. 605, 612 (D. S .D.2004),

> Where federal claims and common law claims are predicated on the same factual allegations and proof will be essentially the same, even if the law of different states might ultimately govern the common law claims-an issue that need not and is not decided at this juncture-certification of the class for the whole action is appropriate. The spectre of having to apply different substantive laws does not warrant refusing to certify a class on the common-law claims.

**\*10** (quotations and alteration omitted); *see also Hanlon,* 150 F.3d at 1022 ("Variations in state law do not necessarily preclude a 23(b)(3) action.").

Here, the variations among some states' unjust enrichment laws are not material because they do not significantly alter the central issue or the manner of proof in this case. Common to all class members and provable on a class-wide basis is whether Defendants unjustly profited from the sale of their fireplaces. *See Schumacher,* 221 F.R.D. at 612 ("In looking at claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs. That is a universal thread throughout all common law causes of action for unjust enrichment."). The "idiosyncratic differences" between state unjust enrichment laws "are not sufficiently substantive to predominate over the shared claims." *See Hanlon,* 150 F.3d at 1022. Overall, Defendants have not shown that the differences among the various state laws are material. Therefore, the Court need not move beyond the first step in the choice of law analysis. Accordingly, common issues of law predominate, as required by Rule 23(b)(3).

**2. Predominance of Factual Issues**

Defendants argue that, irrespective of the choice of law issues, individual factual issues preclude class certification. Determining whether common questions predominate on any of the three claims asserted in this action requires an analysis of the elements of those claims.

**a. UCL**

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. It incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law. *Chabner v. United Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir.2000). Violation of almost any federal, state, or local law may serve as the basis for a UCL claim. *Saunders v. Superior Ct.,* 27 Cal.App. 4th 832, 838-39 (1994). In addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the practice does not violate any law." *Olszewski v. Scripps Health,* 30 Cal.4th 798, 827 (2003). With respect to fraudulent conduct, the UCL prohibits any activity that is "likely to deceive" members of the public. *Puentes v. Wells Fargo Home Mortgage, Inc.,* 160 Cal.App. 4th 638, 645 (2008).

Plaintiffs assert that Defendants' knowing sale of their allegedly hazardous fireplaces and failure to inform Plaintiffs and unnamed class members that Defendants' fireplaces could reach temperatures of 475 degrees and cause third-degree burns on contact generally constitute unfair and deceptive business practices. Defendants argue that proving this claim requires an inquiry into the specific warnings each putative class member received and an assessment of whether those warnings would have misled reasonable members of the public. However, the California Supreme Court has held, "Relief under the UCL is available without individualized proof of deception, reliance and injury." *In re Tobacco II Cases,* 46 Cal.4th 298, 320 (2009). Although there may be individual variations concerning the warnings class members received with their fireplaces, they do not undermine the conclusion that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

common issues predominate on the UCL claim. As the California Court of Appeal noted in *Mass. Mut. Life Ins. Co. v. Superior Court,* 97 Cal.App. 4th 1282, 1292-93 (2002),

> **\*11** The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all. Thus, it is sufficient for our present purposes to hold that if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class.

(Internal quotation marks and citations omitted). Therefore, Plaintiffs may prove with generalized evidence that Defendants' conduct was "likely to deceive" purchasers of their fireplaces. However, "should it develop that class members were provided such a variety of information that a single determination as to materiality is not possible, the trial court has the flexibility to order creation of subclasses or to decertify the class altogether." *Id.* at 1294 n. 5

### b. CLRA

The CLRA makes it unlawful to use "unfair methods of competition or deceptive acts or practices" in the sale of goods or services to a consumer. Cal. Civ.Code § 1770(a). Such unlawful conduct includes "representing that goods or services have ... characteristics[,] ... uses, benefits, or qualities which they do not have," and "representing that goods or services are of a particular standard, quality, or grade ... if they are of another." *Id.* §§ 1170(a)(5) and (7).

Defendants argue that individual factual issues preclude certification because Plaintiffs' CLRA claims require claimant-specific inquiries into causation, reliance and damages. However, "the causation re-

quired by the [CLRA] does not make plaintiffs' claims unsuitable for class treatment." *Mass. Mut.,* 97 Cal.App. 4th at 1292. "Causation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class." *Id.* As noted above, common questions predominate even if Defendants can defeat the showing of causation as to a few individual class members. *Id.* As long as Plaintiffs can show that material misrepresentations were made to the class members, an inference of reliance arises as to the entire class. *Id.* at 1292-93. Materiality is determined from the perspective of the reasonable consumer. *See Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1095 (N.D.Cal.2007).

Plaintiffs' CLRA claim is based on Defendants' alleged failure adequately to disclose to consumers that Defendants' fireplaces could reach temperatures of 475 degrees and cause third-degree burns on contact. Here, the "ultimate question of whether the undisclosed information [is] material [is] a common question of fact suitable for treatment in a class action." *Mass. Mut.,* 97 Cal.App. 4th at 1294. Therefore, common issues will predominate on the CLRA claim. However, as noted above, the Court may create subclasses or decertify the class if a single determination of materiality is not possible. *Id.* n. 5

### c. Unjust enrichment

**\*12** Plaintiffs sufficiently show that common factual issues predominate as to this claim. The common question of whether Defendants' alleged failure to warn Plaintiffs and unnamed class members that Defendants' fireplaces reach temperatures of 475 degrees and cause third-degree burns on contact induced Plaintiffs and unnamed class members to buy homes with those fireplaces installed therein predominates over any questions affecting only individual members.

### B. Superiority

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 668067 (N.D.Cal.)
**(Cite as: 2010 WL 668067 (N.D.Cal.))**

The Court finds that adjudicating class members' claims in a single action would be superior to maintaining a multiplicity of individual actions involving similar legal and factual issues. Although Defendants argue that class action treatment is not superior because they believe individual questions will predominate, they do not identify any other reason why individual actions would be preferable. The Court concludes that this action satisfies Rule 23(b)(3)'s superiority requirement.

CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for class certification. Docket No. 126. The following class is hereby certified pursuant to Fed.R.Civ.P. 23(a) and (b)(3): FN6

>   FN6. The Court modifies Plaintiffs' proposed definition to specify that the fireplaces at issue are "gas" fireplaces.

All consumers who are residents of the United States and who own homes or other residential dwellings in which one or more Superior or Lennox brand single-pane sealed glass front gas fireplaces have been installed since February 6, 2004 and all consumers who are residents of California and own homes or other residential dwellings in which one or more Superior brand single-pane glass sealed front gas fireplaces have been installed since February 6, 2004.

"Consumer" means an individual who bought his or her home or fireplace for personal, family, or household purposes.

Excluded from the class are (1) the judge to whom this case is assigned and any member of the judge's immediate family; and (2) anyone who suffered personal injury related to Defendants' fireplaces

IT IS SO ORDERED.

N.D.Cal.,2010.

Keilholtz v. Lennox Hearth Products Inc.
Slip Copy, 2010 WL 668067 (N.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

2010 WL 366639                                                                                          Page 1
--- F.Supp.2d ----
(Publication page references are not available for this document.)

C

United States District Court,
N.D. California.
Tina WALTER, Christopher Bayless and Eric
Schumacher, individually and on
behalf of all others similarly situated, Plaintiffs,
v.
HUGHES COMMUNICATIONS, INC., and
Hughes Network Systems, LLC, Defendants.
**Case No. 09-2136 SC.**

Jan. 26, 2010.

**Background:** Consumers brought putative class action against Internet provider, alleging supply of online services that were significantly slower than advertised. Provider moved for dismissal.

**Holdings:** The District Court, Samuel Conti, J., held that:

(1) California law was applicable to action;

(2) consumers averred misrepresentations based upon speed and quality of service with sufficient particularity;

(3) consumers failed to allege that termination fees were unlawful penalties; and

(4) consumers failed to state claim for money had and received.

Motion granted in part and denied in part.

West Headnotes

**[1] Contracts** ☞141(1)
95k141(1) Most Cited Cases
Under California law, where contractual choice-of-law provision could have effect of waiving legal protections that are afforded by California law and protected by anti-waiver provision, party seeking enforcement has burden of proof.

**[2] Action** ☞17
13k17 Most Cited Cases
Mere fact that chosen law provides greater or lesser protection than California law, or that in particular application chosen law would not provide protec-

tion while California law would, are not reasons for applying California law.

**[3] Contracts** ☞129(1)
95k129(1) Most Cited Cases
Choice-of-law provision in subscriber agreement, specifying that Maryland law would apply to resolve any disputes, conflicted with fundamental policy set down in California law, and thus California rather than Maryland law was applicable to action brought by consumers against Internet provider, alleging supply of online services that were significantly slower than advertised; Maryland Consumer Protection Act (MCPA) would have limited consumers to compensatory damages, while California Consumer Legal Remedies Act (CLRA) authorized punitive damages to punish or deter offenders. West's Ann.Cal.Civ.Code § 1751; West's Ann.Md.Code, Commercial Law, § 13-101 et seq.

**[4] Federal Civil Procedure** ☞636
170Ak636 Most Cited Cases
Consumers that sued Internet provider, alleging supply of online services that were significantly slower than advertised, averred misrepresentations based upon speed and quality of service with sufficient particularity to state claims under California law, pursuant to federal rules; complaint averred that provider's representations about "typical" service speeds disclosed hard, measurable quantities that could not be characterized as mere puffery. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; West's Ann.Cal.Bus. & Prof.Code §§ 17200, 17500; West's Ann.Cal.Civ.Code § 1750.

**[5] Antitrust and Trade Regulation** ☞224
29Tk224 Most Cited Cases
Consumers that sued Internet provider, alleging supply of online services that were significantly slower than advertised, failed to aver that termination fees constituted unlawful penalties under California law, as required to state claim under Unfair Competition Law (UCL); fees amounted to permissible liquidated damages under subscriber

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
**(Publication page references are not available for this document.)**

agreement at issue. West's Ann.Cal.Civ.Code § 1671.

**[6] Implied and Constructive Contracts ⚖10**
205Hk10 Most Cited Cases
To recover for money had and received under California law, plaintiff must show that definite sum, to which he is justly entitled, has been received by defendant.

**[7] Implied and Constructive Contracts ⚖81**
205Hk81 Most Cited Cases
To allege money had and received under California law, plaintiff must plead that defendant is indebted to plaintiff in certain sum for money had and received by defendant for use of plaintiff.

**[8] Implied and Constructive Contracts ⚖15.1**
205Hk15.1 Most Cited Cases
Cause of action for money had and received under California law is available where plaintiff has paid money to defendant pursuant to contract which is void for illegality.

**[9] Implied and Constructive Contracts ⚖81**
205Hk81 Most Cited Cases
Consumers that sued Internet provider, alleging supply of online services that were significantly slower than advertised, failed to aver definite sum to which they were justly entitled, as required to state claim for money had and received under California law; consumers failed to allege independent cause of action based on termination fee provision in subscriber agreement at issue.

Alan R. Plutzik, Jennifer Susan Rosenberg, Robert M. Bramson, Bramson Plutzik Mahler & Birkhaeuser, LLP, Walnut Creek, CA, Derek T. Braslow, Harris Lee Pogust, Robert N. Wilkey, Pogust, Braslow, & Millrood, LLC, Conshohocken, PA, Joshua Caleb Ezrin, William M. Audet, Audet & Partners, LLP, San Francisco, CA, Francis A. Bottini, Jr., Frank James Johnson, Johnson Bottini, LLP, San Diego, CA, for Plaintiffs.

Robert B. Hawk, J. Christopher Mitchell, Hogan & Hartson LLP, Palo Alto, CA, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS*
SAMUEL CONTI, District Judge.

# I. INTRODUCTION

Plaintiffs Tina Walter ("Walter"), Christopher Bayless ("Bayless") and Eric Schumacher ("Schumacher") (collectively, "Plaintiffs") have brought this purported class action lawsuit against their internet provider for supplying internet services that, they allege, are significantly slower than advertised. *See* Am. Consolidated Class Action Compl. ("Am. Compl."), Docket No. 18. The internet provider, comprised of Hughes Communications, Inc., and Hughes Network Systems, LLC (collectively, "Hughes" or "HughesNet"), has filed a Motion to Dismiss ("Motion"). Docket No. 20. The Motion is fully briefed. *See* Docket Nos. 30 ("Opp'n"), 37 ("Reply"). Having considered all of the briefs submitted by the parties, the Court concludes that this Motion is suitable for resolution without oral argument. For the reasons stated below, Hughes' Motion is GRANTED IN PART and DENIED IN PART.

# II. BACKGROUND

Both Hughes Communications, Inc., and Hughes Network Systems, LLC, are Delaware corporations, with their principal place of business in Germantown, Maryland. Am. Compl. ¶¶ 9-10. Hughes is a satellite broadband internet service provider, which supplies internet access to its customers via satellite. *Id.* ¶ 1. Because this service does not require cable or phone wires, Hughes is able to offer its services to consumers located in remote areas where other broadband services are generally unavailable. *Id.* ¶¶ 1, 29. Plaintiffs are each California residents who have purchased various services from Hughes, and have found these services to be lacking. *Id.* ¶¶ 56-72. Plaintiffs seek to represent the estimated 80,000 California citizens who have subscribed to Hughes' services during the four-year period prior to the filing of this action. *Id.* ¶¶ 13, 16. [FN1]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
**(Publication page references are not available for this document.)**

**A.** *Allegations Related to Hughes' Advertising*

As a provider of broadband internet services, Hughes has marketed its services by representing the high speeds and data transfer rates of the internet connections that it offers. It provides a variety of services at different speeds and prices, such as "residential plans [that] offer speeds up to 1.5 megabits and start at $59.99 per month. Small-business plans start at $99.99 per month and offer maximum speeds of up to 2 megabits per second." *Id.* Ex. A ("Aug. 1, 2006 Newsletter") at 1. On its website, Hughes advertises that its services will allow its users to "download Web pages quickly and ensure timely email delivery." *Id.* Ex. B ("Pl.s' Printout of Hughes Website") at 1. It claims to offer "super-fast, satellite Internet access" with "no dialing in, no waiting and no tied-up phone lines. You can download files in seconds, check email instantly and surf faster than you ever imagined." *Id.* at 2. According to the website, the connection is "up to 30x faster than dial-up," allows users to "[f]lip through Web pages like turning the pages of a book," and "[d]ownload large files in minutes, not hours." *Id.* at 3.

As Hughes points out, its website also includes a page that describes the "[s]peeds you can expect" from its services. Mitchell Decl. Ex. A ("Hughes Printout of Hughes Website") at 1-2. [FN2] This section states that data transfer speeds "will vary based on a variety of factors including the configuration of your computer, the number of concurrent users, network or Internet congestion, the speed of the Websites you are accessing, and other factors. Stated speeds and uninterrupted use of service are not guaranteed." *Id.* It describes each particular plan that is available to its customers, including the Home service plan ("download speeds of up to 1.0 Mbps, with typical speeds of about 550 Kbps to 650 Kbps during peak times") and Pro plan ("download speeds of up to 1.2 Mbps, with typical speeds about 700 Kbps to 800 Kbps during peak times"), all the way up to its ElitePremium Plan ("maximum download speeds of up to 5 Mbps, with typical speeds

about 2.7 to 3 Mbps during peak times"). [FN3] *Id.* at 3.

**B.** *Allegations Related to Hughes' Performance and Service Practices*

Plaintiffs claim that "[i]n reality, HughesNet customers consistently receive slow and spotty service that falls woefully short of the fanciful claims" set forth in Hughes' website and advertisements, and that Hughes' "service during peak times generally performs at speeds lower even than what Hughes-Net states are 'typical' speeds...." Am. Compl. ¶¶ 36-37. Plaintiffs claim that slow speeds extend into non-peak, low volume periods. *Id.* ¶ 44. Plaintiffs allege that Hughes' advertising statements were "meant to[ ] and did induce the Class [to] enter[ ] into agreements for HughesNet's satellite internet service," and that Hughes encourages its customers to upgrade to more expensive services to obtain faster transfer speeds. *Id.* ¶¶ 38-39.

Plaintiffs allege that the slow speeds of Hughes' services are the result of Hughes' practice of "oversell[ing] and/or cap[ping] its customers' internet services such that the actual speeds obtainable under any of the respective service plans is substantially and systematically slower than is advertised." *Id.* ¶ 41. Plaintiffs also allege that Hughes blocks its users from making certain connections, namely Peer-to-Peer (P2P) connections. *Id.* ¶¶ 3.f, 42. Finally, Plaintiffs allege that Hughes implements a "Fair Access Policy" ("FAP") that limits the amount of data that its users may transfer, and which permits Hughes to temporarily reduce a customer's transfer speeds when the customer downloads an amount of data over a short period of time in excess of certain download thresholds. *Id.* ¶¶ 46-47. Plaintiffs claim that "HughesNet's description of and disclosures about the FAP are misleading" because it states that "a small percentage of subscribers who exceed [the threshold] will experience a temporary reduction of speed," while in fact "a large percentage of subscribers experience lengthy shutdowns if they exceed the FAP threshold, sometimes for days at a time." *Id.* ¶ 48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
**(Publication page references are not available for this document.)**

**C.** *Allegations Related to Provisions in Hughes' Subscriber Agreement*

Plaintiffs' Amended Complaint does not stop at the description of the services that Hughes provides its subscribers; it also describes an allegedly illegal termination fee that Hughes imposes when its customers attempt to end their service before the expiration of Hughes' two-year contracts. *Id.* ¶ 53. The Subscriber Agreement states:

> In the event you cancel your subscription to the Service prior to the expiration of the minimum commitment period specified for your applicable service plan, you may be subject [to] a termination fee of up to $700. The exact amount of termination charges which will apply is a function of when your account is terminated and the type of Service Plan you are on.

*Id.* Ex. D ("Subscriber Agreement") ¶ 2.3.

Plaintiffs describe Hughes' practices as follows: "HughesNet unilaterally imposes early termination penalties of hundreds of dollars on [customers who terminate their services early], under purported authority of the Subscriber Agreement. The $400 fee is imposed without any individualized analysis of the actual damages incurred, and even in cases in which HughesNet materially breached the terms of its agreement." *Id.* ¶ 53.

Plaintiffs also refer to the Subscriber Agreement's provision requiring arbitration of all disputes and a "waiver of any class action arbitration," as well as a requirement that all disputes be resolved under Maryland law. *Id.* ¶ 54. The provision reads, in pertinent part, as follows:

> This Agreement and all of the parties' respective rights and duties in connection herewith, including, without limitation, claims for violation of state consumer protection laws, unfair competition laws, and any claims in tort shall be governed by and construed in accordance with the laws of the State of Maryland, in the United States, excluding its conflicts of laws provisions. Any such controversy or claim shall be settled by arbitration, and administered by the American

Arbitration Association under its Commercial Arbitration Rules.... There shall be no class action arbitration pursuant to this Agreement.

Subscriber Agreement ¶ 16. Notably, Hughes has not sought to invoke the arbitration or anti-class action portions of this provision against Plaintiffs, although it has insisted on the exclusive applicability of Maryland law. Mot. at 17-21.

**D.** *Individual Plaintiffs' Experiences*

Bayless subscribed to Hughes' "Pro" service plan, which Hughes represented could provide "up to 1.2Mbps/200Kbps in download/upload speed" in December of 2005, and upgraded to the "ProPlus" service plan (up to 1.6 Mbps) in November of 2006. Am. Compl. ¶ 56. He experienced frequent service interruptions and slowdowns, and found that he was sometimes subject to slowdowns implemented under the FAP. *Id.* ¶ 57. He states that his average speeds were approximately 450 Kbps. He eventually upgraded to the $179.00 per month "ElitePlus" plan (up to 3 Mbps, which he states was advertised as providing minimum speeds of 1.2 Mbps). *Id.* ¶ 58. He found the speeds to be "approximately half those promised or advertised," and even "worse than they had been on the cheaper ProPlus plan." *Id.* He terminated his service in November of 2008 and paid a $300.00 cancellation fee. *Id.* ¶ 59.

Schumacher first signed up for a "TwoWay Service" plan with Hughes in April of 2004, for $59.99 per month. *Id.* ¶ 60. He upgraded to the slightly more expensive "Pro" plan ($69.00 per month for up to 1.2 Mbps) after experiencing slow service. *Id.* ¶¶ 61-62. Even though this service is advertised as achieving "typical" speeds of "about 700 Kbps to 800 Kbps during peak times," Hughes Printout of Hughes Website at 2, Schumacher clocked the speed of his connection "on hundreds of occasions," and found that "[a]t no time during *non*-peak hours did he ever achieve a download speed of 1.2 Mbps. The average speed he achieved during *non*-peak hours was 767 Kbps." Am. Compl. ¶ 65. (emphasis in original). The average download speed for both peak and non-peak hours was 651 Kbps. *Id.* Schu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 360359 Case 4:09-cv-03660-SBA Document 46 Filed 05/03/10 Page 22 of 44 Page 5
--- F.Supp.2d ----
(Publication page references are not available for this document.)

macher upgraded to the "Small Office" plan in March of 2008 (up to 1.5 Mbps), found the service unsatisfactory, and terminated his service in or around January of 2009. *Id.* ¶¶ 66-68.

Walter subscribed to the "Home" service plan in June or July of 2006. She experienced slow transfer speeds and found that the "FAP was implement[ed] more stringently than the disclosures to her had represented." *Id.* ¶ 70. She claims that the network began to slow even "before she reached the represented data threshold" set out by the FAP. *Id.* She eventually switched to the "Pro" plan ($69.00 per month for 1.2 Mbps) and later to the "Elite" plan (2 Mbps for $119.99 per month). *Id.* She frequently experienced speeds below the "typical" speeds advertised by Hughes, even during non-peak times. *Id.* ¶¶ 71-72.

Plaintiffs have asserted six causes of action, including: (1) violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.,* and California's False Advertising Law ("FAL"), *id.* §§ 17500 *et seq.;* (3) negligent misrepresentation and omission; (4) intentional misrepresentation and omission; (5) money had and received; and (6) declaratory relief. *Id.* ¶¶ 73-131. They filed this action against Hughes in this Court in May of 2009, asserting diversity jurisdiction. *Id.* ¶ 11.

### III. *LEGAL STANDARD*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir.1996). Although well-pleaded factual allegations are taken

as true, a motion to dismiss should be granted if the plaintiff fails to proffer "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The court need not accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.

Where plaintiffs allege fraud, or conduct that is sufficiently "grounded in fraud," they must plead their claim with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. *See Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1065-66 (9th Cir.2004); *Vess v. Ciba-Geigy Corp. USA,* **317 F.3d 1097, 1106 (9th Cir.**2003). Plaintiffs must include "**the who, what, when, where, and how**" of the fraud. *Vess,* **317 F.3d at 1106** (citations omitted). A plaintiff satisfies the particularity requirement only if his or her allegations are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (citation and internal quotation marks omitted).

### IV. *DISCUSSION*

#### A. *Choice of Law*

Hughes argues that Plaintiffs' first and second causes of action, for violation of the CLRA, UCL and FAL, must be dismissed because the parties agreed by contract that Maryland law would be applied to resolve any dispute between them related to Hughes' services. Mot. at 17-21. By accepting the Subscriber Agreement, Plaintiffs agreed to have all of their "respective rights and duties in connection" with their service agreements, "including, without limitation, claims for violation of state consumer protection laws, unfair competition laws, and any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims in tort ... governed by and construed in accordance with the laws of the State of Maryland ...." *See* Subscriber Agreement ¶ 16. Plaintiffs argue that this Court should refrain from applying Maryland law because "Maryland consumer law in general conflicts with California's pro-consumer statutes and policies." Opp'n at 17-23. As a federal court sitting in diversity, this Court must apply California's choice-of-law principles to determine whether to enforce the Subscriber Agreement's choice-of-law provision. *See Estate of Darulis v. Garate,* 401 F.3d 1060, 1062 (9th Cir.2005).

In opposing enforcement of the choice-of-law provision in the Subscriber Agreement, Plaintiffs have focused primarily upon the arbitration clause and the bar upon class action arbitration. *Id.* at 17-20. While California courts have long recognized consumers' protected rights to bring class actions under California's various consumer protection statutes, *see, e.g., Am. Online, Inc. v. Super. Ct.,* 90 Cal.App.4th 1, 17-18, 108 Cal.Rptr.2d 699 (Ct.App.2001) (hereinafter "*AOL* "), Hughes has not actually sought to enforce these provisions against Plaintiffs, and there is no indication that Hughes intends to do so in the future. "[A] separate conflict of laws inquiry must be made with respect to each issue in the case." *Wash. Mutual Bank, FA v. Super. Ct.,* 24 Cal.4th 906, 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (Ct.App.2001). At this point, the Court sees no reason to adjudicate the as-of-yet hypothetical dispute regarding the enforceability of the arbitration and anti-class-action provisions. "Accordingly, the Court finds that the issues raised by the arbitration provision are irrelevant to the issue currently presented; if defendant seeks to compel arbitration, the Court will conduct a separate choice-of-law analysis on that issue." *Dajani v. Dell, Inc.,* No. 08-5285, 2009 WL 815352, *2, 2009 U.S. Dist. LEXIS 30194, *6-7 (N.D.Cal. Mar. 26, 2009) (declining to resolve allegations regarding unenforced arbitration provision, but addressing choice-of-law provision).

[1] Under California law, where a contractual clause could have the effect of waiving legal protections that are afforded by California law and protected by an antiwaiver provision, the party seeking enforcement has the burden of proof. *AOL,* 90 Cal.App.4th at 10-11, 108 Cal.Rptr.2d 699. Plaintiffs' first cause of action raises issues under the CLRA, which includes an express antiwaiver provision stating that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." Cal. Civ.Code § 1751. Hughes therefore has the burden of proving that the choice-of-law provision is enforceable. *See AOL,* 90 Cal.App.4th at 10-11, 108 Cal.Rptr.2d 699 (finding that party seeking enforcement held burden of proof, where opposing party had brought claims under CLRA and UCL).

California follows the Restatement Second of Conflict of Laws ("Restatement"), "which reflects a strong policy favoring enforcement of such provisions." *Nedlloyd Lines B.V. v. Super. Ct.,* 3 Cal.4th 459, 464-65, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992). As the California Supreme Court has paraphrased, courts must first "determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction or (2) whether there is any other reasonable basis for the parties' choice of law." *Id.* at 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (citing Restatement § 187(2)). "If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice." *Id.* at 467, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (quoting *Consul Ltd. v. Solide Enterprises, Inc.,* 802 F.2d 1143, 1147 (9th Cir.1986)). Plaintiffs concede that Hughes' principal place of business is located in Maryland, Am. Compl. ¶¶ 9-10, and there can therefore be no reasonable dispute over whether the parties had a substantial relationship with the chosen state. *See Nedlloyd,* 3 Cal.4th at 467, 11 Cal.Rptr.2d 330, 834 P.2d 1148.

[2] "[T]he Court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law." *Id.* at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
**(Publication page references are not available for this document.)**

466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (emphasis in original). "The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Medimatch, Inc. v. Lucent Techs., Inc.,* 120 F.Supp.2d 842, 861-62 (N.D.Cal.2000). Hughes argues that enforcing the laws of Maryland would not be contrary to a fundamental policy of California because Maryland's consumer protection laws offer "comparable protections." Mot. at 19. They refer to the Maryland Consumer Protection Act ("MCPA"), Md.Code Ann., Com. Law §§ 13-101 *et seq. Id.* It states that it is "not materially different from [ ] the analogous California consumer protection[ ] statutes," and cites several cases that have made similar observations. *Id.*

This Court agrees that activities prohibited by the MCPA are nearly identical to those forbidden by the CLRA. Plaintiffs allege that Hughes violated seven provisions of the CLRA: it represented that its services have characteristics which they do not have, Cal. Civ.Code § 1770(a)(5); it represented that its services were of a particular standard or quality when they were of another, *id.* § 1770(a)(7); it advertised its services with the intent to not sell them as advertised, *id.* § 1770(a)(9); it advertised its services with the intent not to supply reasonably expectable demand, *id.* § 1770(a)(10); it misrepresented that it had delivered the promised services, *id.* § 1770(a)(14); and it inserted unconscionable provisions or improper remedies in the Subscriber Agreement, *id.* § 1770(a)(16), (a)(19). *See* Am. Compl. ¶¶ 77- 79. Each of these provisions, except for the provision related to unconscionable contract provisions or remedies, can be paired with an arguably analogous prohibition in the MCPA. *See* MCPA § 13-301(2)(i), (2)(iv), (5)(i)- (ii), 9(iii). Plaintiffs' UCL claims are based upon Hughes' alleged misrepresentations about its services, as well as its use of the FAP and early cancellation fees. Am. Compl. ¶ 91. Hughes does not explain precisely how each of these claims could be cogniz-

able under the MCPA, but this Court will assume, arguendo, that Maryland law creates causes of actions that are comparable to those of California. The Court is satisfied that Maryland law prohibits roughly the same conduct as that prohibited under California law.

As Plaintiffs point out, the greatest difference between California and Maryland law appears to be in the remedies that are available to plaintiffs. The CLRA permits plaintiffs to recover both actual damages and punitive damages, to obtain equitable relief enjoining illegal acts or practices of defendants, and to seek any other relief that the court deems proper. Cal. Civ.Code § 1780(a). In contrast, the remedy set out by the MCPA "is purely compensatory; it contains no punitive component. Indeed, any punitive assessment under the [M]CPA is accomplished by an imposition of a civil penalty recoverable by the State under § 13-410, as well as by criminal penalties imposed under § 13-411. Thus, in determining the damages due the consumer, we must look only to his actual loss or injury caused by the unfair or deceptive trade practices." *Golt v. Phillips,* 308 Md. 1, 12, 517 A.2d 328 (1986); *see also* MCPA § 13-408(a) ("[A]ny person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title."). The MCPA allows no punitive damages, because its private enforcement provision "was not intended to punish [defendants] or set an example for similar wrongdoers." *Citaramanis v. Hallowell,* 328 Md. 142, 154, 613 A.2d 964 (1992).

Similarly, the UCL and FAL both permit injunctive relief. Cal. Bus. & Prof.Code §§ 17203, 17535. Hughes has not commented on whether the MCPA would provide Plaintiffs an opportunity to seek injunctive relief of the kind permitted by California law. This Court's own reading of the statute is that it would not. *See* MCPA § 13-406 (allowing attorney general to seek injunction; making no mention of private plaintiffs); *see also Citaramanis,* 328 Md. at 150, 613 A.2d 964 ("[T]he [M]CPA's public enforcement mechanisms are set up to prevent po-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 360859 Case4:09-cv-03660-SBA Document46 Filed05/03/10 Page25 of 44 Page 8
--- F.Supp.2d ----
(Publication page references are not available for this document.)

tentially unfair or deceptive trade practices from occurring, even before any consumer is injured, whereas § 13-408(a) requires that actual 'injury or loss' be sustained by a consumer before recovery of damages is permitted in a private cause of action.").

Hughes' only response is to perfunctorily dismiss the differences between California and Maryland law as merely concerning remedies, stating that "[t]he relevant question is not whether Maryland law provides exactly the same *remedies* as the UCL and CLRA, but rather whether the MCPA offers comparable *substantive protections* and covers the same *conduct* as the California statutes." Reply at 13 (emphasis in original). To support this proposition, Hughes cites two cases from the Northern District of California: *Medimatch*, 120 F.Supp.2d 842, and *Brazil v. Dell, Inc.*, 585 F.Supp.2d 1158 (N.D.Cal.2008). Neither of these cases support Hughes' proposition that a difference between the laws of two states cannot be "fundamental" merely because it is a difference in available remedies.

*Brazil* involved a consumer dispute under the UCL, FAL and CLRA, in which the plaintiffs had assented to a choice-of-law provision that required disputes to be resolved in accordance with the law of Texas. 585 F.Supp.2d at 1161. The district court noted that Texas law differed from California law in certain minor respects, but found Texas law to be largely analogous in all important respects, and specifically found that the plaintiffs had "fail[ed] to demonstrate how the remedies under the [Texas law] are more limited than those under California law." *Id.* at 1163-64. Similarly, in *Medimatch,* another court in this district considered a choice-of-law provision calling for the application of New Jersey law. 120 F.Supp.2d at 861-62. In that case, the court observed that the "[p]laintiffs cannot, and do not, argue that New Jersey consumer protection law, if applied in California, would violate the state's public policy toward consumers. Indeed, plaintiffs note in their briefing that the New Jersey CFA 'is intended to be one of the strongest consumer protection laws in the nation.' " *Id.* at 862.

Neither of these decisions discussed whether a choice-of-law provision should be enforced where the law of the chosen forum offered substantially more limited remedies than those set out in California law.

Hughes is apparently basing its argument on *Medimatch's* statement that "[t]he mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Id.* at 862; *Brazil,* 585 F.Supp.2d at 1166 (quoting *Medimatch* ). [FN4] This statement is undoubtedly true; however, where another state's laws offer "greater or lesser protection" that runs contrary to a "fundamental policy" of California, then California law applies. *See Nedlloyd,* 3 Cal.4th at 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148. The question is therefore not whether the California and Maryland laws are "comparable," whether they cover the same conduct, or whether the differences "merely" concern remedies. Where a difference in available remedies implicates a fundamental policy set out in California law, the reviewing court must at least take pause before it allows the parties to contract around those policies by choosing to apply foreign law.

[3] The punitive damages sought by Plaintiffs are permitted by the CLRA, which explicitly states that "any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." Cal. Civ.Code § 1751. The CLRA appears to authorize punitive damages to punish or deter offenders, and is consistent with the legislature's intent to allow injured parties to use portions of the CLRA to act as private attorneys general. *See Broughton v. Cigna Healthplans,* 21 Cal.4th 1066, 1080, 90 Cal.Rptr.2d 334, 988 P.2d 67 (1999) ("[T]he evident purpose of the injunctive relief provision of the CLRA is not to resolve a private dispute but to remedy a public wrong.... In other words, the plaintiff in a CLRA damages action is playing the role of a bona fide private attor-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ney general."). The California Supreme Court has held that, in certain contexts, the imposition of punitive damages may be "important to the effectuation" of statutory policies, *see Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 103, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000). [FN5] Given the CLRA's anti-waiver provision and role as a deterrent and check on public harm, this Court concludes that punitive damages are in fact a "fundamental" part of the statutory scheme. The injunctive relief authorized by the UCL and FAL raise similar policy concerns. *See id.* In contrast, the MCPA does not share the same spirit of direct public action; it would allow Plaintiffs to sue to recover their own damages, and it would require them to act indirectly through state actors in order to receive equitable relief or deterrence-based remedies. *See Citaramanis,* 328 Md. at 150, 613 A.2d 964. Because the MCPA would limit Plaintiffs to compensatory damages, this Court finds that the choice-of-law provision in the Subscriber Agreement conflicts with a fundamental policy set down in California law.

In *AOL,* a California court of appeal refused to enforce both a forum selection clause and a choice-of-law provision that entailed the use of Virginia law, where plaintiffs alleged a CLRA violation. 90 Cal.App.4th 1, 108 Cal.Rptr.2d 699. The court cited both the limited remedies available under Virginia law (such as the lack of punitive damages or injunctive relief), as well as limitations on the class action procedures that would be imposed upon the plaintiffs. *Id.* at 15-18, 108 Cal.Rptr.2d 699. While there is no indication that Maryland law would limit Plaintiffs' ability to pursue this suit as a class action, Plaintiffs would be unable to pursue punitive damages authorized by the CLRA, and this Court is not satisfied that Plaintiffs would have access to the equitable remedies they seek. The imposition of Maryland law would therefore probably not compromise Plaintiffs' statutory rights to the same extent that the application of Virginia law would have in *AOL,* but it would nevertheless implicate fundamental policies of California.

Having established that California and Maryland law is different in an important regard, this Court must next inquire whether California has a "materially greater interest" than Maryland in imposing its laws to resolve the current dispute. *Nedlloyd,* 3 Cal.4th at 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148. Hughes contends that Maryland has a greater interest in "protecting Hughes' interest in having its transactions uniformly governed by Maryland law." Mot. at 20. This Court disagrees. California has a stronger interest in protecting its consumers through its chosen mechanisms--a statutory scheme that permits its injured consumers not only to bring class actions to recover their losses, but also to seek punitive damages and injunctive relief in order to deter and prevent future harm to other consumers located in the state. The fact that Maryland law, by and large, forbids the same conduct as California's consumer protection laws actually undermines Hughes' argument, because Maryland companies would presumably not be required to alter their behavior to conform to both sets of laws. Maryland companies need only be mindful of the fact that, when acting in California, they may be subject to the sharper teeth embodied by California's consumer protection regime. This Court therefore concludes that this particular suit must be governed by California law, at least with respect to Plaintiffs' UCL, FAL, and CLRA claims. [FN6]

**B. *Whether Plaintiffs Have Stated a Claim Under the UCL, FAL, and CLRA***

As previously noted, Plaintiffs allege that Hughes violated the CLRA by: (1) representing that its services have characteristics which they do not have; (2) representing that its services were of a particular standard or quality when they were of another; (3) advertising its services with the intent to not sell them as advertised; (4) advertising its services with the intent not to supply reasonably expectable demand; (5) representing that a transaction involves remedies that it does not, or which are prohibited by law; (6)representing that a transaction has been supplied in accordance with previous representa-

**(Publication page references are not available for this document.)**

tions when it has not been; and (7) inserting unconscionable provisions in the Subscriber Agreement. *See* Am. Compl. ¶¶ 77-79. Plaintiffs' UCL claims are based upon Hughes' alleged misrepresentations about its services, as well as its use of the FAP and early cancellation fees. Am. Compl. ¶ 91.

Hughes claims that all of Plaintiffs' causes of action fail to "state a claim for relief that is plausible on its face," Mot. at 7-11, and that those causes of action that sound in fraud do not state claims with sufficient particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure, *id.* at 11-14. One need not plead fraud in order to state a claim under the CLRA, UCL, or FAL. *See Nordberg v. Trilegiant Corp.,* 445 F.Supp.2d 1082, 1097 (N.D.Cal.2006). However, as the Ninth Circuit has observed:

> While fraud is not a necessary element of a claim under the CLRA and UCL, a plaintiff may nonetheless allege that the defendant engaged in fraudulent conduct. A plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of that claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading ... as a whole must satisfy the particularity requirement of Rule 9(b).

*Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir.2009) (quoting *Vess,* **317 F.3d at 1103-04).**

### 1. *Allegations Related to Hughes' Representations of the Speed and Quality of its Services*

[4] The Court first addresses Plaintiffs' allegations related to Hughes' representations and advertisements regarding the speed and quality of its services, which comprise their claims under the UCL, FAL, and CLRA. [FN7] As Plaintiffs are alleging that Hughes has made these misrepresentations intentionally to deceive its consumers, these allegations sound in fraud. The Court nevertheless finds that Plaintiffs have pled enough facts to state claims for relief that are both particular and plausible on

their face.

The Amended Complaint does more than merely claim that Hughes was advertising that its services were "fast" while the services it provided were "slow." It specifically alleges that Schumacher was unable to experience the speeds that Hughes had advertised its service as reaching "up to," even during non-peak hours. Am. Compl. ¶ 65. The Amended Complaint provides printouts of Hughes' publications that state "typical" speeds during peak times, *id.* Ex. B, but Schumacher claims that his average speeds during presumably faster non-peak times actually fell within the stated "peak" range, and that speeds during peak times were even slower than the advertised "typical" peak speeds. Am. Compl. ¶ 65. Bayless claims to have experienced average speeds that were slower than any of the "typical" speeds published by Hughes, and that speeds for more expensive plans were in fact slower than speeds for cheaper plans. *See id.* ¶¶ 57, 58. Both Bayless and Walter claim to have frequently experienced slowdowns due to Hughes' FAP, and Walter claims that she experienced these slowdowns even before she had reached the applicable download thresholds. *Id.* ¶¶ 57, 70. Although the Amended Complaint does contain a large number of vague and conclusory statements related to the speed and performance of Hughes' networks, the allegations related to the individual Plaintiffs' experiences are detailed, mutually supportive and, when taken together, plausible enough to survive a motion to dismiss.

Hughes claims that it did not promise or represent that users would achieve particular speeds or average speeds. Mot. at 8-9. It similarly claims that no reasonable consumer would be misled by their representations, and that many of the representations that Plaintiffs identify are mere "puffery." *Id.* at 14-17. It is true that Courts may sometimes dismiss claims of deceptive practices where potentially deceptive language is tempered by the juxtaposition of clear and unambiguous language that makes it unlikely that a reasonable person may be deceived

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
**(Publication page references are not available for this document.)**

by the representations. *See Freeman v. Time, Inc., 68 F.3d 285, 289-90 (9th Cir.1995)* (agreeing that "[i]t is clear from the exemplar that no reasonable addressee could believe that the mailing announced that the addressee was already the winner ..."). However, the general rule is that whether the disparity between actual services and representations about those services is "deceptive" under the FAL, UCL, and CLRA is "a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer." *See Linear Technology Corp. v. Applied Materials, Inc., 152 Cal.App.4th 115, 134-35, 61 Cal.Rptr.3d 221 (Ct.App.2007)* (quoting *McKell v. Wash. Mutual, Inc., 142 Cal.App.4th 1457, 1472-73, 49 Cal.Rptr.3d 227 (Ct.App.2006)*).

This Court believes that Plaintiffs' allegations are sufficient to call into question Hughes' representations as to the speed of its services, even when they are considered in light of its representations about its "typical" speeds. Hughes' representations disclose hard, measurable quantities that cannot be characterized as mere "puffery." Plaintiffs claim that they were often unable to reach even the "typical" speeds, and that the off-peak speeds ended up being as slow as the advertised "typical" speeds. A reasonable jury could find that representations about its internet services are deceptive even in light of Hughes' disclosures that it could not guarantee any particular or average speed. Whether the experience of these Plaintiffs was unique, or whether it was ultimately the result of lawful and non-deceptive causes (such as a judicious application of the FAP) is a question to be answered later.

Hughes also argues that actual reliance is an element of fraud-based claims under the FAL, UCL and CLRA, and claims that Plaintiffs have failed to plead the "who, what, when, where and how" of the alleged misconduct. Mot. at 12-13 (quoting *Kearns, 567 F.3d at 1124, 1125-26).* Although Plaintiffs cite a number of recent representations and advertisements, Hughes points out that "all of the allegedly misleading statements identified by plaintiffs were made years after plaintiffs signed up for the Hughes service, making it impossible for plaintiffs to have relied upon them." *Id.* at 13. The question is whether Plaintiffs can meet their burden for pleading reliance without identifying the particular advertisements or representations upon which they relied when they entered or upgraded their service with Hughes.

The Court is satisfied that the pleadings in the Amended Complaint are sufficiently particular to plead reliance. Although Plaintiffs have not cited specific advertisements that predate their use of Hughes' services, each Plaintiff alleges that they subscribed to Hughes' services based on Hughes' representations, which (although roughly described) are comparable to the more recent representations, which are alleged with greater particularity. Am. Comp. ¶¶ 56, 61, 69. Plaintiffs are, in essence, asking this Court to make an inference that Hughes' representations have been consistent over time in certain material respects, dating back for the last several years. *Id.* The Court finds this to be a reasonable inference. Because Plaintiffs have identified recent, particular representations from Hughes' marketing campaign, and alleged that they relied on similar or identical representations made at earlier times, Plaintiffs have adequately notified Hughes of the claims against it. *Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir.2001)* (citation and internal quotation marks omitted) ("To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."); *cf. In re Tobacco II Cases, 46 Cal.4th 298, 328, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009)* ("[W]here, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that he relied on particular advertisements or statements.").

While Plaintiffs' pleadings are less particular re-

**(Publication page references are not available for this document.)**

garding Hughes' allegedly illegitimate use of the FAP, as well as its theory that Hughes intentionally "oversold" its services by providing services to more clients than it had the bandwidth to support, the Court sees no harm in permitting Plaintiffs to proceed with either of these arguments. Both are potential explanations for Plaintiffs' experiences with slow internet connections, and are pled as elements that contribute to these slow speeds, rather than as independent causes of action. *See* Am. Compl. ¶ 43. Both topics will therefore be ripe for discovery, whether this Court construes them as independent theories of recovery or not. When taken together with Plaintiffs' allegations regarding their slow transfer rates, the Court finds that these allegations present plausible claims. [FN8]

2. *Allegations Related to Hughes' Termination Fees*
[5] Plaintiffs allege that Hughes' termination fees are unlawful penalties under Civil Code sections 1671(c) and (d) (" § 1671"), and therefore "unlawful" under the UCL. Am. Compl. ¶ 93. Plaintiffs claim that these fees are imposed "without any individualized analysis of the actual damages incurred." *Id.* ¶ 53. Plaintiffs liken the termination fees provision to a liquidated damages provision. *See id.* ¶ 93. Under section 1671 of the California Civil Code:

> [In a] contract for the retail purchase, or rental, by such party of personal property or services, primarily for the party's personal, family, or household purposes, ... [¶] ... a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

Cal. Civ.Code § 1671(c)-(d).

Hughes argues that Plaintiffs have failed to sufficiently plead a claim that is plausible on its face, because "no pled facts support [the] bald conclusion" that the provision violates California law. Mot. at 10-11. It faults Plaintiffs for not pleading

facts that indicate how the early termination fees are actually applied in practice. *Id.* at 11.

This Court agrees that Plaintiffs have failed to allege a plausible claim for violation of § 1671. California courts have defined "liquidated damages" as "an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement...." *See Chodos v. W. Publ. Co.,* 292 F.3d 992, 1002 (9th Cir.2002) (quoting *Kelly v. McDonald,* 98 Cal.App. 121, 125, 276 P. 404 (Ct.App.1929)). The allegations in the Amended Complaint undermine the contention that the termination fee set out in section 2.3 of the Subscriber Agreement is in fact a claim for liquidated damages. This provision states that customers who terminate their subscription before the specified date "may be subject [to] a termination fee of up to $700," but that the "exact amount ... is a function of when your account is terminated and the type of Service Plan you are on." Subscriber Agreement ¶ 2.3. Although Plaintiffs allege that a "$400 fee is imposed without any individualized analysis of the actual damages incurred," the Amended Complaint only mentions a single specific application of this provision, when Bayless was subject to a $300 fee. Am. Compl. ¶¶ 53, 59. This belies Plaintiffs' conclusory claim that the termination fee was a fixed sum. Plaintiffs have therefore failed to allege that the Subscriber Agreement included a fixed fee that constituted impermissible liquidated damages under § 1671. *Cf. Ruwe v. Cellco P'ship,* 613 F.Supp.2d 1191, 1196, 1198 (N.D.Cal.2009) (discussing requirement that liquidated damage provision include "fixed fee" to maintain § 1671 claim).

Plaintiffs also allege that the fee is "unconscionable," and therefore in violation of the CLRA, which forbids "[i]nserting an unconscionable provision in the contract." Cal. Civ.Code § 1770(19). The term "unconscionable" "has both a procedural and a substantive element. The former takes into consideration the parties' relative bargaining strength and the extent to which a provision is 'hidden' or unexpected, while the substantive element

2010 WL 366859 Case4:09-cv-03660-SBA Document46 Filed05/03/10 Page30 of 44 Page 13
--- F.Supp.2d ----
(Publication page references are not available for this document.)

requires terms that 'shock the conscience' or at the least may be described as 'harsh or oppressive.' " *Trend Homes, Inc. v. Super. Ct.,* 131 Cal.App.4th 950, 956, 32 Cal.Rptr.3d 411 (Ct.App.2005) (quoting *Woodside Homes of California, Inc. v. Sup. Ct.,* 107 Cal.App.4th 723, 727, 132 Cal.Rptr.2d 35 (Ct.App.2003)). Plaintiffs simply state that the imposition of the fee was unconscionable, without explaining how it "shocked the conscience" or was "harsh or oppressive" at the time the agreements were entered into. Plaintiffs indicate that the $300 cancellation fee paid by Bayless was less than two-months worth of service charges at the time he made it. *See* Am. Compl. ¶¶ 58-59. Plaintiffs have not alleged that Hughes incurred no costs in providing their services, and "the fee may be viewed not only as a charge to recompense the [provider] for its costs incurred in [providing the services], but as a deferred fee for all of the services provided ... in opening, maintaining, and terminating" the relationships between the parties. *See Morris v. Redwood Empire Bancorp,* 128 Cal.App.4th 1305, 1323-24, 27 Cal.Rptr.3d 797 (Ct.App.2005) (dismissing unconscionability claim for bank termination fees). The "shock the conscience" standard is a high one, and Plaintiffs have simply not pled enough facts to support a claim for unconscionability.

Finally, Plaintiffs contend that the termination fee provision is void because Hughes' duties under the contract are entirely illusory. Am. Compl. ¶¶ 52, 129. Plaintiffs allege that "the Subscriber Agreement does not commit HughesNet to *anything* with respect to internet service," because Hughes disclaims any representation that services will be "uninterrupted or operate at any minimum speed." *Id.* ¶ 52 (emphasis in original) (quoting Subscriber Agreement ¶ 11.1). "An illusory promise is one containing words in promissory form that promise nothing and which do not purport to put any limitation on the freedom of the alleged promisor." *Flores v. Am. Seafoods Co.,* 335 F.3d 904, 912 (9th Cir.2003). "Under California law, an obligation under a contract is not illusory if the obligated party's

discretion must be exercised with reasonableness or good faith." *Milenbach v. Comm'r,* 318 F.3d 924, 930 (9th Cir.2003). The Court rejects Plaintiffs' extreme reading of the Subscriber Agreement--no reasonable person would conclude that the contract did not bind Hughes to provide at least some minimal level of internet-related services. The mere fact that the contract permitted Hughes an unspecified level of interruption or poor transfer rates does not render Hughes' obligations illusory.

The Court therefore DISMISSES the first cause of action for violation of the CLRA only with respect to Plaintiffs' allegations regarding the termination fees. The Court also DISMISSES the second cause of action for violation of the FAL and UCL, only with respect to Plaintiffs' allegations regarding Hughes' termination fees. Although the Court finds that Plaintiffs have not adequately pled that the termination fee provision, in and of itself, gives rise to independent causes of action, the Court makes no judgment at this time as to whether the termination fees paid by Plaintiffs may be cognizable as damages under their other theories of recovery.

### C. *Money Had and Received*

[6][7][8] Plaintiffs' fifth cause of action is for money had and received. Am. Compl. ¶¶ 120-26. "The foundation of an action for conversion on a money had and received count is the unjust enrichment of the wrongdoer, and in order for plaintiff to recover in such action she must show that a definite sum, to which she is justly entitled, has been received by defendant." *Bastanchury v. Times-Mirror Co.,* 68 Cal.App.2d 217, 236, 156 P.2d 488 (Ct.App.1945). A plaintiff must plead that the defendant "is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." *Schultz v. Harney,* 27 Cal.App.4th 1611, 1623, 33 Cal.Rptr.2d 276 (1994) (citation and internal quotation marks omitted). "The cause of action is available where ... the plaintiff has paid money to the defendant pursuant to a contract which is void for illegality." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 366039
Case4:09-cv-03660-SBA   Document46   Filed05/03/10   Page31 of 44   Page 14
--- F.Supp.2d ----
(Publication page references are not available for this document.)

[9] Plaintiffs base their claim for money had and received upon the allegation that "HughesNet has become indebted to Plaintiff [sic] and class members in the amount of early termination fees paid during that period and such other amounts which may have been acquired by means of any practice found by this Court to be illegal, unfair or deceptive ...." Am. Compl. ¶ 122. This fails to state a "definite sum" to which Plaintiffs are justly entitled. The Court has already determined that Plaintiffs have failed to state an independent cause of action based on the termination fee provision in the Subscriber Agreement. Plaintiffs have not otherwise alleged that the relevant portions of the Subscriber Agreement were void. They cite no authority for the proposition that money received as a result of deceptive advertising practices can be recoverable under a theory of money had and received. Consequently, this cause of action is DISMISSED.

D. *Declaratory Relief*

As Plaintiffs' sixth cause of action, they request declaratory relief, and ask this Court to determine the rights and obligations of the parties under the Subscriber Agreement. Am. Compl. ¶¶ 127-31. This Court has already addressed most of the bases upon which Plaintiffs request declaratory relief: It has concluded that Hughes' obligations under the contract were not illusory, and it has declined to address the arbitration and anti-class action provisions as there is currently no controversy between the parties with respect to these issues. The Court has further found that Plaintiffs have not alleged a basis for voiding the termination-fee provision.

Plaintiffs allege that "HughesNet's failure to provide service reasonably consistent with its advertisements and promises excused any further performance by class members." *Id.* ¶ 129b. The Amended Complaint does not attempt to allege that Hughes had undertaken a duty to provide internet services at any particular speed (in fact, it alleges quite the opposite, see *id.* ¶ 52), or that Hughes' slow service speeds were so unreasonable as to constitute a breach of the Subscriber Agreement. If

Plaintiffs seek a finding that they are excused from performance due to Hughes' nonperformance, they must clearly allege facts that are suggestive of Hughes' breach of contract. Based on this Court's reading of the Subscriber Agreement, Plaintiffs do not allege that slow connection speeds alone amounted to nonperformance on Hughes' part. [FN9] Plaintiffs' sixth cause of action is therefore DISMISSED.

V. *CONCLUSION*

The Court hereby GRANTS IN PART and DENIES IN PART Hughes' Motion to Dismiss. The Court DENIES Hughes' Motion to Dismiss Plaintiffs' first and second causes of action, except that the Court hereby STRIKES Plaintiffs' allegations regarding the illegality of Hughes' termination fees. Plaintiffs have leave to amend their allegations regarding Hughes' termination fees. The Court DENIES Hughes' Motion to Dismiss Plaintiffs' third and fourth causes of action. Plaintiffs' fifth and sixth causes of action are DISMISSED WITHOUT PREJUDICE.

Should Plaintiffs choose to submit a second amended complaint, it must be submitted no later than thirty (30) days after the date of this Order.

IT IS SO ORDERED.

> FN1. Plaintiffs also seek to include a subclass of "consumers" as defined by California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1761(d), who were Hughes' subscribers in the three years prior to filing this action. Am. Compl. ¶ 14.

> FN2. Christopher Mitchell, counsel for Hughes, submitted a declaration in support of the Motion, Docket No. 21, which attached a printout of Hughes' website. Hughes has submitted a Request for Judicial Notice, Docket No. 22, which refers to this printout. Plaintiffs have cited and de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----

**(Publication page references are not available for this document.)**

scribed various portions of Hughes' website throughout their Complaint, and they have not questioned the authenticity of the printout submitted by Hughes. *See al-Kidd v. Ashcroft,* 580 F.3d 949, 955 n. 6 (9th Cir.2009) (taking judicial notice of entire contents of document cited in complaint and available online). The Court notes that the Amended Complaint appears to specifically describe the portion of the website that Hughes has submitted. Am. Compl. ¶¶ 37, 49-50. Considering the Amended Complaint's direct references to this portion of the website, the Court finds that it may consider the printout without converting this Motion into a motion for summary judgment.

FN3. The abbreviations "Mbps" and "Kbps" stand for megabits per second and kilobits per second, respectively. Each megabit is equivalent to about 1000 kilobits. Consequently, the "typical" speeds disclosed above are roughly 55% to 65% as fast as the download speeds that these connections can get "up to."

FN4. *Medimatch* cites the case of *Wong v. Tenneco,* 39 Cal.3d 126, 135-36, 216 Cal.Rptr. 412, 702 P.2d 570 (1985), immediately after it states the quoted passage. 120 F.Supp.2d at 861-62. It then offers the following parenthetical quotation from *Wong:* "[T]he standard is whether the chosen law is so offensive to California public policy as to be prejudicial to recognized standards of morality and to the general interest of the citizens." *Id.*; *Wong,* 39 Cal.3d at 135-36, 216 Cal.Rptr. 412, 702 P.2d 570. When the California Supreme Court made this statement in *Wong,* it was addressing a question of international comity: whether a California Court can be enlisted to aid in the enforcement of a contract, the substance of which is illegal in

the place where the contract was formed? *Id.* at 128, 216 Cal.Rptr. 412, 702 P.2d 570. It noted that there was a public policy exception that allowed California courts to enforce foreign contracts that were illegal, so long as the laws that rendered them illegal were themselves offensive to California public policy. *Id.* at 135-36, 216 Cal.Rptr. 412, 702 P.2d 570.

This Court believes this standard would set the bar far too high in cases that address the enforceability of choice-of-law provisions. Indeed, there is no indication that either *Brazil* or *Medimatch* actually applied this remarkably high bar to the choice-of-law provisions that they were considering. The California Supreme Court has stated that the proper standard is whether a "fundamental policy" is contravened. *Nedlloyd,* 3 Cal.4th at 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148. There may be circumstances, like those presented in the current case, where the law of another state is contrary to a fundamental policy of California, but where that law is not offensive to recognized standards of morality. California law reflects a measured policy decision to enlist injured citizens as private attorneys general--this may be a fundamental policy, even though alternative policy decisions need not be classified as "offensive."

FN5. At least one other court in this district has recently found that a statutory punitive damage provision in an employment discrimination statute could not be circumvented by a choice-of-law provision that calls for the application of Canadian law. *Martin v. D-Wave Sys.,* No. 09-3602, 2009 WL 4572743, *5, 2009 U.S. Dist. LEXIS 111561, *13-14 (N.D.Cal. Dec. 1, 2009).

FN6. The vast majority of Hughes' argu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

ments regarding choice-of-law issues focuses exclusively on Plaintiffs' statutory causes of action under the UCL, FAL, and CLRA. It has cited to Maryland case law only with respect to two points in relation to other causes of action, and on these issues the Court can find no material difference from the relevant California law. Because Hughes and Plaintiffs both rely primarily upon California and Ninth Circuit law, this Court does not address the question of whether Maryland law should control Plaintiffs' nonstatutory causes of action, and proceeds to analyze these causes of action under California law.

FN7. Plaintiffs allege causes of action for intentional and negligent misrepresentation or omission based on the same facts as their FAL, UCL and CLRA claims regarding the representation of services provided. Am. Compl. ¶ ¶ 99-119. Hughes has blended its analysis of the first four causes of action in much of its own briefing. The Court therefore does not separately address or analyze Plaintiffs' misrepresentation-based causes of action.

FN8. Plaintiffs' Amended Complaint includes brief allegations that Hughes "selectively block[s] certain types of connections," including P2P connections. Am. Compl. ¶ 3. The Court notes that Plaintiffs do not clearly or explicitly integrate this into a particular cause of action, or explain how it presents a basis for recovery. The Court therefore does not construe this as an independent theory of recovery.

FN9. This is, of course, a question that is wholly separate from the question of whether the slow performance of Hughes' services rendered their contrary representations and advertisements deceptive or fraudulent.

--- F.Supp.2d ----

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit C

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Washington.
Chad M. CARLSEN and Shasta Carlsen husband and
wife, et al., and Barbxra Hulse; each individually and
on behalf of a Class of similarly situated Washington
residents, Plaintiffs,
v.
FREEDOM DEBT RELIEF, LLC, LLC, a Delaware
limited liability company, et al., Defendants.
**No. CV-09-55-LRS.**

March 26, 2010.

**ORDER GRANTING MOTION FOR CLASS
CERTIFICATION, *INTER ALIA***

LONNY R. SUKO, Chief Judge.

**\*1 BEFORE THE COURT** are the Plaintiffs' Mo-
tion For Class Certification (Ct.Rec.35) and Defen-
dants' Motion To Compel Arbitration And Dismiss
(Ct.Rec.57). These motions were heard with oral ar-
gument on March 16, 2010. Darrell W. Scott, Esq.,
argued for Plaintiffs. Sally Gustafson Garratt, Esq.,
argued for Defendants. Also before the court is Plain-
tiffs' Motion To Strike Exhibits Attached To The
Declaration Of Sally Gustafson Garratt (Ct.Rec.74).
That motion has been considered without oral argu-
ment.

**I. BACKGROUND**

This is a diversity class action commenced by Plain-
tiffs against the Defendants [FN1], alleging Defendants
have violated Washington's Debt Adjusting statute,
RCW Chapter 18.28, and/or aided and abetted a vio-
lation of the same, and that these violations constitute
a violation of Washington's Consumer Protection Act
(CPA), RCW Chapter 19.86. Defendant Freedom
Debt Relief, LLC, ("FDR") is a company which of-
fers "debt reduction services" to clients and "negoti-
ates settlement terms with a client's creditor." Defen-
dant Freedom Financial Network ("FFN") is the par-
ent company of FDR. As discussed in the court's
"Order Denying Motions To Compel Arbitration,

*Inter Alia"* in the related case of *Carlsen v. Global
Client Solutions,* CV-09-246-LRS (Ct.Rec.40),
Global Client Solutions, LLC (GCS), is in the busi-
ness of receiving funds for the purpose of distributing
those funds among creditors in payment or partial
payment of obligations of debtors, including the
Plaintiffs. GCS, in partnership with Rocky Mountain
Bank and Trust (RMBT), maintains and manages
debt settlement accounts that are part of "debt reduc-
tion services" offered by companies such as FDR.

> FN1. The federal Class Action Fairness Act
> (CAFA) expanded federal jurisdiction over
> putative and certified class actions where the
> matter in controversy exceeds $5,000,000,
> determined by aggregating the claims of the
> individual class members. 28 U.S.C. Section
> 1332(d)(1), (2), (6) and (8). Complete diver-
> sity of parties is not required. Diversity un-
> der the CAFA exists if any member of a
> class of plaintiffs is a citizen of a State dif-
> ferent from any defendant.

Plaintiffs' Second Amended Complaint in the cap-
tioned matter alleges that class members, including
named Plaintiffs (Carlsens and Hulse) executed a
standardized "Debt Reduction Agreement" with FDR
which provided for a total fee that exceeded fifteen
percent (15%) of the total debt listed on the contract,
provided for an initial fee exceeding $25, and pro-
vided for fees exceeding 15% of the individual pay-
ments made by each class member, all in violation of
RCW 18.28.080.

**II. DISCUSSION**

**A. Arbitration**

Defendants seek an order from the court enforcing
the arbitration clauses in the agreements between
FDR and the Carlsens, and FDR and Hulse. Plaintiffs
do not dispute there was an agreement to arbitrate,
but contend the agreement is not enforceable. [FN2]

> FN2. In *Carlsen v. Global Client Solutions*
> CV-09-246-LRS, the court found the Carl-
> sens and Pophams did not agree to arbitrate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

their dispute with GCS and RMBT, and therefore did not reach the issue of enforceability.

9 U.S.C. § 2 of the Federal Arbitration Act ("FAA") provides in relevant part that "an agreement in writing to submit to arbitration an existing controversy arising out of ... a contract, transaction, or refusal [to perform the same], shall be valid, irrevocable, and enforceable, **save upon such grounds as exist at law or in equity for the revocation of any contract."** (Emphasis added). Whether an arbitration agreement is enforceable under the FAA is generally determined by reference to common-law principles of general applicability. *Southland Corp. v. Keating,* 465 U.S. 1, 19-20, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

**\*2** While the issue of unconscionability of a contract or clause of a contract is a question of law for the court, the decision is one based on the factual circumstances surrounding the transaction in question. *Tjart v. Smith Barney, Inc.,* 107 Wash.App. 885, 898, 28 P.3d 823 (2001). The burden of proving that a contract or contract clause is unconscionable rests upon the party attacking it. *Id.* Washington recognizes two types of unconscionability. Substantive unconscionability "involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh .... " *Id.* quoting *Schroeder v. Fageol Motors, Inc.,* 86 Wash.2d 256, 260, 544 P.2d 20 (1975). Procedural unconscionability is the lack of a meaningful choice, considering all of the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print. *Id.*

The agreement the Carlsens entered into with FDR contains an arbitration clause which is different from the arbitration clause contained in the agreement between Hulse and FDR. The Hulse agreement constitutes the later version of the agreement.

Paragraph 9 in the Carlsen agreement, entitled "Arbitration of Dispute," states:

> IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE PARTIES AGREE TO SUBMIT THAT DISPUTE

TO BINDING ARBITRATION UNDER THE AUSPICES OF THE AMERICAN ARBITRATION ASSOCIATION (AAA). VENUE FOR SUCH ARBITRATION WILL BE IN SAN FRANCISCO, CA. BINDING ARBITRATION MEANS THAT BOTH PARTIES GIVE UP THE RIGHT TO TRIAL BY JURY. IT ALSO MEANS THAT BOTH PARTIES GIVE UP THE RIGHT TO APPEAL FROM THE ARBITRATOR'S RULING EXCEPT FOR A NARROW RANGE OF ISSUES THAT ARE APPEALABLE UNDER CALIFORNIA LAW. IT ALSO MEANS THAT DISCOVERY MAY BE SEVERELY LIMITED BY THE ARBITRATOR.

(Text in Capital Letters).

The Carlsen agreement also contains a Paragraph 8 entitled "Governing Law; Severability:", which states:

> This Agreement is governed by the laws of the State of California, without regard to the conflict of law rules of that state. If any provision of this Agreement is held to be unenforceable the remainder of this Agreement shall remain in full force and effect.

The Hulse agreement contains the identical "Governing Law; Severability" clause at Paragraph 8.

The arbitration clause of the Hulse agreement is found at Paragraph 9 and it states:

> THE EVENT OF ANY CONTROVERSY, CLAIM OR DISPUTE BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION OR VALIDITY THEREOF, INCLUDING THE TERMINATION OF THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, SHALL BE DETERMINED BY ARBITRATION IN SAN FRANCISCO, CALIFORNIA OR IN THE COUNTY IN WHICH THE CONSUMER RESIDES, IN ACCORDANCE WITH THE LAWS OF STATE OF CALIFORNIA FOR AGREEMENTS TO BE MADE IN AND TO BE PERFORMED IN CALIFORNIA. THE PARTIES AGREE THE ARBITRATION SHALL BE

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") PURSUANT TO ITS RULES AND PROCEDURES AND AN ARBITRATOR SHALL BE SELECTED BY THE AAA.... THE PARTIES AGREE THAT EITHER PARTY MAY BRING CLAIMS AGAINST THE OTHER ONLY IN HIS/HER OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, THE PARTIES AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS OF MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF REPRESENTATIVE OR CLASS PROCEEDINGS. THE PARTIES SHALL SHARE THE COST OF ARBITRATION, INCLUDING ATTORNEY'S FEES, EQUALLY. IF THE CONSUMER['S] SHARE OF THE COST IS GREATER THAN $1,000 (ONE-THOUSAND DOLLARS), THE COMPANY WILL PAY THE CONSUMER['S] SHARE OF THE COSTS IN EXCESS OF THAT AMOUNT. ...

**\*3** (Text in Capital Letters).

The Plaintiffs contend the arbitration clauses are substantively unconscionable. According to Plaintiffs, the Hulse agreement is substantively unconscionable because it attempts to evade consumer protection laws by depriving consumers of class action procedures, whereas the Carlsen agreement is substantively unconscionable because it deprives indebted consumers of meaningful opportunity for redress by requiring that claims be pursued in San Francisco under California law.

Defendants say they are willing to arbitrate the claims of each Plaintiff in the county where each Plaintiff resides and to not enforce the "Choice of Law" clause.[FN3] In other words, Defendants are willing to forego San Francisco as the venue for arbitration and have Washington law apply to the arbitration, including the Debt Adjusting statute and the Consumer Protection Act. Defendants assert the severability clauses in the agreements permit the court to sever the venue and choice of law provisions. Defendants' willingness to forego enforcement of these provisions is understandable given that this court finds it would be substantively unconscionable to require financially-strapped Washington citizens to travel to San Francisco to arbitrate a dispute without the benefit of Washington's Consumer Protection Act.

> FN3. Arguably, the Hulse agreement dictates this considering its language that "arbitration [shall be] in San Francisco, California **or in the county in which the consumer resides,** in accordance with the laws of the State of California **for agreements to be made in and performed in California."** (Emphasis added). Hulse resides in Grant County in the State of Washington and her agreement with FDR was not made in or to be performed in California. One could speculate that the venue and choice of law provisions in the later Hulse agreement, as compared to the earlier Carlsen agreement, were motivated by concerns over the enforceability of the provisions in the earlier Carlsen agreement which leave no doubt that venue for arbitration will be in San Francisco and that California law will apply.

Defendants maintain the class action waiver in the Hulse agreement is not substantively unconscionable and they assert that both the Carlsens and Hulse should proceed to arbitration of their individual claims. The Carlsen agreement, unlike the Hulse agreement, does not contain a class action waiver and is silent on the issue of classwide arbitration. Prior to 2003, the general consensus expressed in federal case law was that classwide arbitration was legally impermissible unless specifically permitted by the pertinent arbitration clause. See *Champ v. Siegel Trading Co. Inc.,* 55 F.3d 269, 275 (7th Cir.1995) (where the parties are bound by an arbitration agreement and the agreement is silent on class action procedures, a federal court may not order class action treatment). In *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), the U.S. Supreme Court held that because an arbitration clause did not specifically preclude classwide arbitration, the Federal Arbitration Act did not foreclose classwide arbitration, and whether arbitration was permissible was a matter of state-law contract interpretation. Furthermore, the Court held it was for the arbitrator to decide if there should be class certification and therefore, classwide arbitration. *Id.* at 453.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

Under *Green Tree,* the presumption would be that classwide arbitration is not foreclosed by the arbitration clause in the Carlsen agreement and, assuming the clause is otherwise enforceable, an arbitrator should determine whether the clause allows for classwide arbitration.

The prohibition of classwide arbitration found in the arbitration clause in the Hulse agreement is substantively unconscionable under Washington law. In *Scott v. Cingular Wireless,* 160 Wash.2d 843, 161 P.3d 1000 (2007), the plaintiffs brought a class action against the defendant alleging it had overcharged consumers by unlawfully adding roaming charges and hidden charges. The Washington Supreme Court held the class action waiver in the arbitration clause of the standard subscriber contract for cellular telephone service, which waived both class action litigation and class action arbitration, violated Washington state public policy and therefore, was substantively unconscionable. The court concluded the arbitration clause was unenforceable and since the clause itself provided that if any part of the same was found unenforceable, the entire clause was void and there was no basis for compelling arbitration. *Id.* at 847, 161 P.3d 1000.

**\*4** The state supreme court explained why the class action waiver was substantively unconscionable:

> Class actions are vital where the damage to any individual consumer is nominal, and that vital piece is exactly what the plaintiffs claim the class action waiver before us seeks to eviscerate.

> Thus, we conclude that without class actions consumers would have far less ability to vindicate the CAA. [Citation omitted]. Again, the CPA contemplates that individual consumers will act as "private attorneys general," harnessing individual interests in order to promote the public good. [Citation omitted]. **But by, mandating that claims be pursued only on an individual basis, the class arbitration waiver undermines the legislature's intent that individual consumers act as private attorneys general by dramatically decreasing the possibility that they will be able to bring meritorious suits.**

> Without class action suits the public's ability to perform this function is drastically diminished. We

agree with plaintiffs and the Washington attorneyeneral and conclude the class action waiver clause beAre us is an unconscionable violation of this State's policy to "protect thepublic and foster fair and honest competition," RCW 19.6.920, because it drastically forestalls attempts to vindicate consumer rights. To the extent that this clause prevents CPA cases, it is substantively unconscionable.

*Id.* at 853-54, 161 P.3d 1000 (emphasis added).

The court found there was an additional consideration in deeming the clause substantively unconscionable:

> Of course on its face, the class action waiver does not exculpate Cingular from anything; it merely channels dispute resolution into individual arbitrationroceedings or small claims court. But, in effect this exculpates Cingular from legal liabilityor any wron where the cost of pursuit outweighs the potential amount ofrecovery....

> In such cases, the ability to proceed as a class transforms a merely theoretical possible remedy into a real one. [Citation omitted]. It is often the only meaningful type of redress available for small but widespread injuries. [Citations omitted]. Without it, many consumersma not even realize that they have a claim. [Citations omitted]. The class action provides a mechanism to alert them to this act. Second, again, claims as small as those in this case are impracticable to pursue on an individual basis even in small claims court, andarticularly in arbitration. Shiftinghe cost of arbitration to Uingular does not seem likely to make it worth the time, energy, and stress to pursue such individually small claims.[FN4]

>> **FN4.** Here, FDR does not agree to bear all of the costs of arbitration. In the Hulse agreement, FDR does agree to cover the consumer's share of costs in excess of $1,000. As discussed *infra,* that is insufficient to save the class action waiver from being substantively unconscionable. The Carlsen agreement does not say anything specific about arbitration costs and the assumption would be that FDR and the client share the arbitration costs equally.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

*Id.* at 855-56, 161 P.3d 1000.

The state supreme court rejected Cingular's argument that the Federal Arbitration Act required the court to enforce the class action waiver. In doing so, it found that Congress only required that arbitration clauses be put on the same footing as other contracts. *Id.* at 858, 161 P.3d 1000. It observed that:

> Class action waivers have very little to do with arbitration. Clauses that eliminate causes of action, eliminate categories of damages, or otherwise strip away a party's right to vindicate a wrong do not change their character merely because they are found within a clause labeled "Arbitration." At least, based on the briefing before us we see no reason why the urposes of favoring individual arbitration would not equally 7avor class-wide arbitration. [Citation omitted].

**\*5** *Id.* at 858, 161 P.3d 1000.

In the subsequent case of *McKee v. AT & T Corp.,* 164 Wash.2d 372, 191 P.3d 845 (2008), the Washington Supreme Court declared unconscionable a choice of law provision in a "Consumer Services Agreement" which designated New York law as controlling. The court found "the choice of New York law in this case is unconscionable ... because it conflicts with Washington's fundamental public policy favoring the availability of class-based relief for small consumer claims." *Id.* at 386, 191 P.3d 845. The court held that "Washington's strong Consumer Protection Act policy favoring class adjudication of small-dollar claims is a 'fundamental policy' ...." *Id.* To no surprise, the court also found substantively unconscionable the provision within the "Dispute Resolution" section of the agreement that prohibited classwide arbitration. *Id.* at 397, 191 P.3d 845. It emphasized, however, that class action waiver has nothing to do with a valid agreement to arbitrate because class actions are often arbitrated and promote the prime objective of an agreement to arbitrate which is streamlined proceedings and expeditious results. *Id.* at 395, 191 P.3d 845.

In *McKee,* the state supreme court affirmed the trial judge's decision that the unconscionable terms within the "Dispute Resolution" section of the agreement (waiving class actions, requiring confidentiality, shortening the limitations period, and limiting attor-

ney's fees) could not be severed because they "permeate the entire arbitration agreement." *Id.* at 402, 191 P.3d 845. AT & T requested the unconscionable provisions from the "Dispute Resolution" section be stricken and that the balance thereof be enforced, but the court declined to do so, noting that "when unconscionable provisions so permeate an agreement, we strike the entire section or contract." *Id.* The court found that severance of the unconscionable terms which tainted the entire "Dispute Resolution" section would essentially require the court to rewrite the dispute resolution agreement. *Id.* at 403, 191 P.3d 845. According to the court:

> Permittin severability as requested by AT & T in the face of a contracirthat is permeated with unconscionability only encourages those who draft contracts of adhesion to overreach. If the worst that can happen is the offensive provisions are severed and the balance en orced, the dominant party has nothing to lose by inserting one-sided, unconscionable provisions.

> *Id.*

The arbitration clause in the Hulse agreement provides that if the client's 50% share of the costs of arbitration is greater than $1,000, FDR will pay the client's share in excess of $1,000. That is an insufficient reason for the court to not find the class action waiver unconscionable. Defendants' argument is that this provision makes individual arbitrations appropriate in lieu of classwide arbitration. The figures cited by Plaintiffs, however, do not bear this out: $1,000 exceeds the debt adjuster fees at issue for more than 30% of those Washington consumers who terminated FDR's services, and represents more than 50% of the debt adjuster fees for 70% of that same group; and more than 60% of those who completed FDR's program would have to incur costs exceeding 30% of the total fees they paid in order to pursue a claim to individually arbitrate their claims. Thus, one cannot conclude that the prospect of having FDR pay the client's share of the arbitration costs in excess of $1,000 would provide adequate incentive for the majority of clients to arbitrate their individual small-value claims.

**\*6** In *Shroyer v. New Cingular Wireless Services, Inc.,* 498 F.3d 976 (9th Cir.2007), the defendant argued its arbitration clause did not deter customers

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

from arbitrating individual small-value claims because per the clause, defendant agreed to pay the full cost of arbitration, and plaintiffs who received awards equal to or greater than their demands would receive attorney's fees. The Ninth Circuit rejected this argument and concluded that under California law, the class action waiver in the arbitration clause was unconscionable. The Ninth Circuit noted the concern of the California courts is that "when the potential for individual *gain* is small, very few plaintiffs, if any, will pursue individual arbitration or litigation, which greatly reduces the aggregate liability a company faces when it has exacted small sums from millions of consumers." *Id.* at 986, citing *Discover Bank v. Superior Court of Los Angeles,* 36 Cal.4th 148, 158-62, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (Cal.2005) (emphasis in text). The California courts did not suggest a waiver is unconscionable only when or because a plaintiff in arbitration may experience a net loss, including attorneys' fees and costs. *Id.*

In the case before this court, Plaintiffs make the same point: "aggregation of Washington consumer's claims through class litigation [or arbitration] entirely eliminates barriers to prosecution of consumer's claims because litigation [or arbitration] costs are advanced by class counsel, incurred by consumers only if Class members prove successful, and owing to economies of class litigation, would be a small fraction of those incurred, were the consumers to proceed individually." The Carlsens and Hulse are obviously not the only Washington clients of FDR and furthermore, while there are perhaps some clients who paid enough in fees to FDR that they would not be economically deterred from pursuing individual arbitration against FDR, this is not the only consideration. Without class litigation or arbitration, companies like FDR have little difficulty with arbitration of individual small-value claims. It is a different matter, however, when such companies are faced with the prospect of aggregate liability through class litigation or arbitration.

The forum selection and choice of law provisions in the arbitration clauses contained in the Carlsen and Hulse agreements, and the class action waiver provision in the arbitration clause in the Hulse agreement, are substantively unconscionable under Washington law. Despite the willingness of the Defendants to forego enforcement of the venue and choice of law provisions, and despite the existence of the severabil-

ity clauses in the agreements, the court finds the unconscionable provisions so permeate the arbitration clauses and the agreements as a whole that they cannot and should not be severed for the reasoning provided in *McKee,* and that arbitration (individual or classwide) should not be compelled. The arbitration and governing law clauses in the Carlsen and Hulse agreements are stricken in their entirety.

**B. Class Certification**

**\*7** Plaintiffs seek an order certifying this matter as a class action designating a class composed of all Washington residents who have executed a Debt Reduction Agreement with FDR and/or FFN, appointing named Plaintiffs (Carlsens and Hulse) as class representatives, designating Mr. Scott as class counsel, and providing for submission and approval of appropriate and timely notice to class members.

Plaintiffs ask that the class be certified pursuant to Fed.R.Civ.P. 23(b)(3) on the basis of a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In addition to making that finding in order to certify a class, the court must also determine that certain prerequisites listed in Rule 23(a) have been met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Defendants seemingly do not challenge that the first two prerequisites of Rule 23(a) are met, those being "numerosity" [FN5] and "commonality." As discussed below, the questions of law and fact present in the claims of each putative class member are not only "common," but pursuant to Rule 23(b)(3), "predominate" over questions affecting individual members in the putative class and, on balance, a class action is superior to other methods for adjudicating the controversy. And because of this, the "typicality" and "adequacy" prerequisites of Rule 23(a) are also satisfied.

    FN5. Defendants do not dispute that they

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

have continuously engaged in business since 2003 and that over 1,000 Washington consumers have contracted with Defendants.

Defendants argue they are not "debt adjusters" as defined in Washington's Debt Adjusting statute, RCW 18.28.010, and concede this is a question of law common to the claims of all putative class members. Nevertheless, Defendants contend class certification is inappropriate because "[e]ach Washington client has had a different experience with the program" and "[a]s a result, the Court will be faced with an endless variety of facts and circumstances for each individual regarding whether his or her situation meets the requirements for sustaining this action."

This action is about the Defendants, pursuant to a standardized debt reduction agreement, allegedly charging each putative class member fees in excess of those specified in RCW 18.28.080. It is alleged the fee structure was the same in each individual case. The common question of fact is simply whether the fees charged and collected were in violation of the statute, or not. If they were excessive in violation of RCW 18.28.080, a standard remedy is prescribed in RCW 18.28.090: "the debt adjuster's contract with the debtor shall be void and the debt adjuster shall return to the debtor the amount of all payments received from the debtor or on the debtor's behalf and not distributed to creditors."

**\*8** Defendants suggest some putative class members may not have been injured, and that those who claim they were injured, may not be able to show the cause of their injury was related to Defendants' actions. Being charged a fee in excess of that allowed in RCW 18.28.080 constitutes "injury" *per se.* RCW 18.28.080 amounts to a recognition that anything charged and collected above the specified fee limits constitutes injury to Washington consumers. By definition, an individual is injured if he is charged and pays too much in violation of the statute. Per RCW 18.28.185, a violation of RCW 18.28.080 constitutes an unfair and deceptive act or practice in the conduct of trade or commerce under the Consumer Protection Act (RCW Chapter 19.86). A violation of RCW 18.28.080 is a *per se* violation of the Consumer Protection Act. All of the elements of a CPA violation are satisfied because RCW 18.28.080 was enacted to protect the public from excessive fees. Indeed, RCW 18.28.190 makes it a criminal misdemeanor to violate

any provision of the Debt Adjusting statute. A violation of RCW 18.28.080 affects the public interest, injures the party who was charged the excessive fee, and obviously the charging of the excessive fee causes the injury.

Defendants assert that "88 Washington clients have completed the FDR program and every one of them has saved more money from their reduced debt than they have paid in fees to FDR and benefited significantly from their enrollment in the program." That, however, is not the relevant question. The relevant question is whether those 88 clients were charged and paid fees in excess of the limits specified in RCW 18.28.080. If so, they were injured and are entitled to the remedy specified in RCW 18.28.090.

It is true that Plaintiffs' Second Amended Complaint alleges some "individual claims" that are unique to the Carlsens. (See Paragraphs 67-89 of Second Amended Complaint). These individual claims are for alleged fraudulent misrepresentations made by Defendants to the Carlsens, and the claims relate to how Defendants performed with regard to certain debts owed by the Carlsens. Plaintiffs propose these individual claims be bifurcated from the class proceeding altogether, deferred for resolution until the class proceeding is completed, referred for resolution on a parallel track involving other proceedings acceptable to the parties, or litigated along side the class claims. The existence of these individual claims does not diminish the fact that common questions of law (are Defendants "debt adjusters" as defined in RCW 18.28?) and fact (did Defendants collect fees from their clients in excess of the limits specified in RCW 18.28.080 pursuant to standardized agreements?) "predominate" in this matter so as to justify class certification.

Defendants assert the contracts with their clients have "varied substantially over the years" and that these differences defeat "predominance." Significant, however, is that Defendants do not assert the fee structure of these contracts varied substantially in such a fashion as to eliminate "predominance" of a common question whether fees charged and collected were in violation of RCW 18.28.080. There appears to be no dispute that the debt reduction agreements were standardized in regard to fees charged and collected.

**\*9** It is not enough that common questions "predomi-

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

nate." There must also be a finding that a class action is "superior" to individual lawsuits for resolving the dispute. Defendants contend a class action is not "superior" to other available methods of adjudication because "[f]or those who are displeased with some aspect of the program, they may litigate their claims individually." Defendants assert the Carlsens and Hulse acknowledge as much "by asking the Court to litigate their individual claims separate and apart from any class litigation." The Carlsens and Hulse have now made clear that they believe their summary judgment motion should be deferred pending resolution of the class certification issue and the court has advised the parties this is how it intends to proceed.

Defendants contend the availability of individualized claim resolution is enhanced by the existence of contractual arbitration, noting that all FDR clients, including the Carlsens and Hulse, signed contracts containing arbitration clauses. The court has found, however, that these clause are not enforceable because of substantively unconscionable provisions contained therein.

Defendants assert that even if the arbitration clauses are unenforceable, the amount of fees paid by the clients is such that the clients could "easily" bring actions for relief in small claims court ($5,000 limit) or (state) district court ($50,000 limit).[FN6] As Plaintiffs point out, there are likely a significant number of FDR clients who are unaware they might have claims related to the fees charged and collected from them. According to Plaintiffs' figures, undisputed by Defendants, the vast majority of class members have claims valued at $3,000 or less as measured by the total fees paid, with 45% having claims involving fees of $1,999 or less, and only two having claims involving fees exceeding $15,000. There is not a likelihood of large individual recoveries. These are "small-value" (also referred to as "negative value") individual claims.

> FN6. Litigation in state court is discussed as an option because if there is no class certification and no federal diversity subject matter jurisdiction under the Class Action Fairness Act (CAFA), it is doubtful there is traditional diversity jurisdiction (complete diversity between Plaintiffs and Defendants and/or no individual claim exceeding $75,000 jurisdictional amount), and there

certainly is no federal question jurisdiction.

The purposes of a class action are to avoid a multiplicity of actions and to enable persons to assert small claims that would not be litigated individually because the costs would far outweigh any recovery. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 349, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). Lawyers are not allowed in Washington small claims courts and certainly, an individual does not have to hire an attorney and can proceed *pro se* in state district court, thereby avoiding payment of attorney fees. Cost, however, is not the only issue here. These are not simple disputes which can be easily presented by *pro se* litigants. Resolution of the disputes involves interpretation of Washington's Debt Adjusting statute (i.e., is FDR a "debt adjuster") for which there is a complete absence of relevant case law and legislative history. In this case, and the related case of *Carlsen v. Global Client Solutions,* CV-09-246-LRS, this court is likely to certify questions of first impression to the state supreme court for resolution. In sum, *pro se* litigants would be at a decided disadvantage in trying to present their cases in state court, and the cost of hiring an attorney would be prohibitive relative to the small value of the claims. Indeed, the likelihood of finding an attorney to take on an individual claim would be diminished because of the small value of the claim and the prospect of a small recovery.

**\*10** In *Dix v. ICT Group, Inc.,* 160 Wash.2d 826, 837, 161 P.3d 1016 (2007), the Washington Supreme Court found unenforceable a forum selection clause because it precluded class actions for small-value Consumer Protection Act (CPA) claims and there was no feasible alternative for seeking relief on such claims. According to the court:

> The individual consumer action to enforce RCW 19.86.020 and vindicate the public interest is ... a significant aspect of a dual enforcement scheme under the CPA, which provides for individual private actions in addition to enforcement actions brought by the attorney general. **But in some circumstances, the costs** *and inconvenience* **of suit may be too great for individual actions,** *even in small claims court.* We agree, therefore, that class suits are an important tool for carrying out the dual enforcement scheme of the CPA. Individual claims may be so small that it otherwise would be impracticable to bring them; a class action may be the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

only means that the public interest may be vindi-
cated.

 160 Wash.2d at 837, 161 P.3d 1016 (emphasis
added). Per RCW 18.28.185, a violation of Washing-
ton's Debt Adjusting statute constitutes a *per se* viola-
tion of the CPA.

A class action is a "superior" method for resolving
individual claims here. None of the individual claims
are of significant value and, when viewed objec-
tively, the absence of a class action would likely de-
ter individual actions. *Dix, 160 Wash.2d at 841, 161
P.3d 1016.*

The "typicality" requirement of Rule 23(a) is that the
claims or defenses of the class representatives must
be typical of the claims or defenses of the class. In
practice, the "commonality" and "typicality" re-
quirements of Rule 23(a) tend to merge as both serve
as a guideposts for determining whether maintenance
of a class action is economical and whether the
named plaintiffs' claims and the class claims are so
interrelated that the interests of the class members
will be fairly and adequately protected in their ab-
sence. *General Tel. Co. of Southwest v. Falcon,* 457
U.S. 147, 157, 102 S.Ct. 2364 n. 13, 72 L.Ed.2d 740
(1982). The claims of the purported class representa-
tives need not be identical to the claims of other class
members, but the class representative "must be part
of the class and possess the same interest and suffer
the same injury as the class members." *Id.* at 156. A
plaintiff's claim is typical if it arises from the same
event or practice or course of conduct that gives rise
to the claims of other class members, and is based on
the same legal theory as their claims. *Rosario v.
Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992).

The Carlsens and Hulse have claims which are iden-
tical to the claims of other class members, those be-
ing the claims which allege FDR charged and col-
lected fees in excess of the limits specified in RCW
18.28.080 pursuant to standardized agreements it had
with its clients. As discussed above, the Carlsens are
also asserting some unique individual claims for
fraud resulting in injury unique to them, but the
"typicality" requirement remains satisfied by virtue
of the Carlsens (and Hulse) asserting claims identical
to other class members alleging FDR charged and
collected fees in excess of the limits specified in
Washington's Debt Adjusting statute.

*11 Defendants contend the Carlsens and Hulse have
not demonstrated they will fairly and adequately rep-
resent the class because they "have chosen to proceed
individually, seeking summary judgment on liability
for themselves prior to a determination on class certi-
fication." In doing so, Defendants assert the Carlsens
and Hulse have put their own interests on a different
footing from those of the putative class. As noted,
hearing and resolution of the motion for summary
judgment has been deferred pending resolution of the
class certification motion.

The test for "adequacy" is whether: 1) the attorney
representing the class is qualified and competent; 2)
the class representatives are not disqualified by inter-
ests antagonistic to the remainder of the class; and 3)
the named plaintiffs must prosecute the action vigor-
ously on behalf of the class. *In re Mego Fin'l Corp.
Secur. Litig.,* 213 F.3d 454, 462 (9th Cir.2000). De-
fendants do not dispute that Mr. Scott is qualified and
competent to represent the class. For the reasons al-
ready discussed, the Carlsens and Hulse do not have
interests which are not antagonistic to the remainder
of the class.

Plaintiffs have demonstrated that all of the prerequi-
sites of Rule 23(a)-numerosity, commonality, typical-
ity, and adequacy of representation-are met. Further-
more, Plaintiffs have established, pursuant to Rule
23(b)(3), that questions of law and fact common to
the class "predominate" over questions affecting the
individual members and, on balance, a class action is
"superior" to other methods available for adjudicat-
ing the controversy.

### III. CONCLUSION

Defendants' Motion To Compel Arbitration And
Dismiss (Ct.Rec.57) is **DENIED.** Plaintiffs' Motion
For Class Certification (Ct.Rec.35) is **GRANTED.**
Plaintiffs' Motion To Strike Exhibits Attached To
The Declaration Of Sally Gustafson Garratt
(Ct.Rec.74) is **DENIED as moot** with respect to
Plaintiffs' Motion For Class Certification, although
the court will consider the motion with respect to
Plaintiffs' Motion For Summary Judgment at the time
that motion is heard.

The Fed.R.Civ.P. 23(b)(3) class is composed of all
State of Washington residents who have executed a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286616 (E.D.Wash.)
**(Cite as: 2010 WL 1286616 (E.D.Wash.))**

Debt Reduction Agreement with FDR and/or FFN. Named Plaintiffs, Chad M. Carlsen, Shasta L. Carlsen, and Barbara Hulse, are designated as representatives for the class. Darrell W. Scott, Esq., is appointed as class counsel pursuant to Fed.R.Civ.P. 23(g). The class claims, issues, or defenses are as identified above. Within ten (10) days from the date of this order, class counsel will serve and file a proposed "Notice" to class members for the court's review and approval. This "Notice" will comply with the requirements of Fed.R.Civ.P. 23(c)(2)(B). Defendants will have ten (10) days from service of the proposed "Notice" to serve and file any objections to the same. Class counsel will have five (5) days from service of any objections to serve and file any reply to the same.

**\*12** After notice is provided to the class members and following the expiration of the "opt-out" period, class counsel will re-note the Plaintiffs' Motion For Summary Judgment As To Consumer Protection Act Liability And Final Or Preliminary Injunctive Relief (Ct.Rec.47). Disposition of that motion is **STAYED** pending it being re-noted for hearing.[FN7]

> FN7. The court will consider whether questions should be certified to the state supreme court, including whether Defendants are "debt adjusters" subject to Washington's Debt Adjusting statute. If the parties agree that is an appropriate course of action and can agree on the questions to be certified, the process can be expedited and it may be possible to consolidate presentation of those questions with the questions anticipated to be presented to the state supreme court in *Carlsen v. Global Client Solutions,* CV-09-246-LRS.

Resolution of the individual claims of the Carlsens is deferred pending completion of the class proceeding.

**IT IS SO ORDERED.** The District Court Executive is directed to forward copies of this order to counsel of record.

E.D.Wash.,2010.
Carlsen v. Freedom Debt Relief, LLC
Slip Copy, 2010 WL 1286616 (E.D.Wash.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.